395 A.2d 938

**COMMONWEALTH of Pennsylvania ex rel. Russell GIBSON**

**v.**

**Attillio DiGIACINTO, Warden of Northampton County Prison.**

**Appeal of Russell GIBSON.**

Superior Court of Pennsylvania.

Submitted March 20, 1978.

Decided Dec. 14, 1978.

54

Margaret H. Poswistilo, Easton, for appellant.

Edward G. Ruyak, Bethlehem, for appellee, Northampton County.

Before JACOBS, President Judge, and HOFFMAN, CERCONE, PRICE, VAN der VOORT, SPAETH and HESTER, JJ.

HESTER, Judge:

This is an appeal from the lower court's order certifying Appellant's involuntary commitment to a mental hospital under date of August 26, 1977 by the Court of Common Pleas of Northampton County, *Civil Division.* In essence, the instant appeal is analogous with a Petition for a Writ of Habeas Corpus.

The complex set of operative facts in this matter are as follows:

On January 14, 1977, Appellant was admitted to Easton Hospital pursuant to Section 302 of the Mental Health Procedures Act of 1976 [1] for a period not to exceed seventy-two (72) hours. The cause for Appellant's admission to Easton was Appellant's disruptive and threatening behavior at a youth home. The following day (January 15, 1977) Appellant eloped from Easton Hospital.

On January 19, 1977, Appellant was admitted to Allentown State Hospital pursuant to the terms of the original commitment order of January 14 for a continued in-patient examination under Section 303 of the Mental Health Procedures Act for a period not to exceed twenty (20) days. Appellant remained at Allentown until February 3, 1977 as an involuntary committee, at which time his attending physician recommended that Appellant be treated as an out-patient at the Mental Health Clinic in Easton, Pennsylvania. Throughout the aforementioned proceedings, jurisdiction over Appellant rightfully was maintained by the Court of Common Pleas of Northampton County, Civil Division.

1. The Act of July 9, 1976, P.L. 817, No. 143, Sec. 101 et seq.; 50 P.S. 7101 et seq.

On March 21, 1977, Appellant was arrested and charged in a Criminal Complaint with Attempted Arson[2], Burglary[3], and Criminal Mischief[4]. On June 28, 1977, Appellant entered into a negotiated plea bargain to the criminal charges of Criminal Mischief and Criminal Trespass (The Commonwealth having previously reduced the Criminal Burglary to Criminal Mischief and dismissed the charge of Attempted Arson). Following Appellant's plea and prior to sentencing, and because of Appellant's prior mental history, the Criminal Court Judge ordered a complete psychiatric and psychological evaluation to aid the Court in its disposition as part of Appellant's presentencing report. In doing so, the Criminal Court invoked Article IV of the Mental Health Procedures Act which is broadly titled "Determinations affecting those charged with crime under sentence"; specifically, Section 7405, which provides:

> 7405. Examination of person charged with crime as aid in sentencing.
>
> Examination Before Imposition of Sentence. Whenever a person who has been criminally charged is to be sentenced, the court may defer sentence and order him to be examined for mental illness to aid it in the determination of disposition. This action may be taken on the court's initiative or on the application of the attorney for the Commonwealth, the person charged, his counsel, or any other person acting in his interest. If at the time of sentencing the person is not in detention, examination shall be on an outpatient basis unless inpatient examination for this purpose is ordered pursuant to the civil commitment provisions of Article III.
>
> 1976 July 9, P.L. 817, No. 143, Sec. 405, effective in 60 days.

2. The Crimes Code, Act of December 6, 1972, P.L. 1482, No. 334, Sec. 1, 18 Pa.C.S., Sec. 3301.

3. The Crimes Code, *supra*; 18 Pa.C.S., Sec. 3502.

4. The Crimes Code, *supra*; 18 Pa.C.S., Sec. 3304.

Accordingly, Appellant was remanded to the Northampton County Prison, at which place he was examined by Dr. Donald Oh, a court-appointed psychiatrist who, coincidentally, also had examined Appellant in January while Appellant was under the jurisdiction of the Court of Common Pleas of Northampton County, Civil Division, while at Easton Hospital in mid-January. During this period, Appellant was also examined by Dr. Stephen Barrett, also a psychiatrist. According to the report filed by Dr. Oh, Appellant was "severely mentally disabled and in need of continuous treatment."

In accordance therewith, the Appellee in the instant case, filed a Petition for Appellant's involuntary commitment pursuant to the applicable terms of Section 304 of the Mental Health Procedures Act. Said applicable provisions are as follows:

(c) Procedures for Initiating Court-ordered Involuntary Treatment for Persons not in Involuntary Treatment.—(1) Any responsible party may file a petition in the court of common pleas requesting court-ordered involuntary treatment for any person not already in involuntary treatment for whom application could be made under subsection (a).

(a) Persons for Whom Application May be Made.—(1) A person who is severely mentally disabled and in need of treatment, as defined in section 301(a)[1], may be made subject to court-ordered involuntary treatment upon a determination of clear and present danger under section 301(b)(1) (serious bodily harm to others), or section 301(b)(2)(i) (inability to care for himself, creating a danger of death or serious harm to himself), or 301(b)(2)(ii) (attempted suicide), or 301(b)(2)(iii) (self mutilation).

ARTICLE III. INVOLUNTARY EXAMINATION AND TREATMENT.

7301. Persons who may be subject to involuntary emergency examination and treatment.

(a) Persons Subject.—Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled

when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself.

(b) Determination of Clear and Present Danger.—(1) Clear and present danger to others shall be shown by establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is a reasonable probability that such conduct will be repeated. . . .

(2) Clear and present danger to himself shall be shown by establishing that within the past 30 days:

(i) the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act.

Following the 304(c) hearing before the Northampton County Mental Health Review Officer on August 2, 1977, Appellant petitioned for a hearing *de novo* before a civil division judge.[5] Appellant's petition was granted and a hearing was held before Judge Alfred T. Williams, Jr. on August 25, 1977.

5. Section 303(g) of the Act provides:

"Petition to Common Pleas Court.—In all cases in which the hearing was conducted by a mental health review officer, a person made subject to treatment pursuant to this section shall have the right to petition the court of common pleas for review of the certification. A hearing shall be held within 72 hours after the petition is filed unless a continuance is requested by the person's counsel. The hearing shall include a review of the certification and such evidence as the court may receive or require. If the court determines that further involuntary treatment is necessary and that the procedures prescribed by this act have been followed, it shall deny the petition. Otherwise, the person shall be discharged.

At hearing, five (5) persons testified: Donald Flyte, correction officer, Northampton County Prison, Ludwig Grucela, Supervisor, Northampton County Prison, and three (3) psychiatrists, Drs. Donald Oh, Marjorie G. Morrison, and Stephen J. Barrett.

Mr. Flyte testified that on July 15, 1977:

"A.  As I opened the cell, there was smoke in the cell. Russell stamped out the fire. At that time, he picked up a newspaper which was folded up and was approximately burned one-quarter of the way. I told Russell he had to go down to the cage. Russell then proceeded to pick up the newspaper. He took it in his—We went down the steps leading down to the cage area and Russell deposited the newspaper that was burned and stamped out, he deposited it into a wastepaper can.

Q.  Was the paper actually burning?

A.  It wasn't burning when he put it in the can. It was burned as I opened the cell, was put out.

Q.  Were there any other cellmates in the area?

A.  No, there was no one in Russell's cell at that time." (T. pp. 5–6)

Next, Mr. Grucela testified:

"On July 25th, I was supervisor when Officer Dean brought a handmade weapon, made out of a coat hanger—.   .   ."

"Handmade weapon, which was fashioned something like a pronged knife, which I reported to Mr. Olander. Put it on my reports. On August 11th, Mr. Gibson approached me—I was in the mess hall, in the dining room—and he asked me why I was trying to send him to Fairview. I said, "Russell, I'm not trying to send you to Fairview." He then said—I explained to him that my testimony at the prior hearing was only to try to help him and I testified to incidents that happened. He said, "Well, somebody sent me to Fairview. You're going to pay." At that, he walked away. Prior to July 15th I had

problems with him taking his medicine, medication . . .

Q. From your observations of him, Superintendent, are you of the opinion that he needs further confinement?

A. Yes. There was an incident where he was—I was called to his cell. He was in G48, I think—and he was knocking furniture around, and I went up and entered his cell. I sat down and I tried to calm him, talk to him, and he related to me—I asked him what was wrong. He related that voodoo spirits were bothering him, people on the street were putting voodoo on him, naked women were coming in and trying to rape him, and stuff like this. It was really nonsense stuff. I spent about 15, 20 minutes with him that night and finally calmed him down. He was very, very, emotionally disturbed.

Q. Are you of the opinion, from his behavior pattern, that he probably needs mental health treatment?

A. Definitely.

Q. Did you consider what he said in August a threat to you?

A. Yes, I did.

Q. The items that you related—this burning of fire and people chasing him and the coat hanger episode—are they the normal activities of prisoners?

A. No, they're not." (T. pp. 11–12)

And, on cross-examination:

"Q. Mr. Crucela, with regard to this hanger that was fashioned into an implement of some kind, did you say it resembled a knife, a pronged knife?

A. Yes. It's a coat hanger that's screwed into the wall. It was bent out with the screw end out and the back part made so you could grip it. It would be a very, very vicious weapon if you got it in the belly or stomach." (T. p. 14)

Finally, on direct:

"Q. From your testimony, from your observations and from the various episodes that were related here by you this morning concerning Mr. Gibson, do you have any opinion as to whether or not he presents a clear and present danger to himself and to others?

A. Yes, I do.

Q. What is your opinion?

A. I think he—From statements he made to me, that he might injure someone else or himself." (T. p. 16)

Next, the Court heard from Dr. Oh, the Court-appointed psychiatrist who examined Appellant on July 19, 1977, and who concluded:

"My psychiatric finding was that he was suffering from mental illness, so-called, with the symptoms of psychosis, and he showed a very suspicious attitude and behavior along with symptoms that he was not able to control himself at that time." (T. p. 18).

"A. The result was I found him mentally ill and he needed medical assistance at that time, and symptoms showed he was not comprehending realities right away, and also he was hearing things from other sources which was not from himself, and he also believed that people are against him and they want to kill him and he, in turn, had to kill them. He had expressed homicidal ideations at that time." (T. p. 19)

"Q. Well, did he indicate to you that anybody is controlling his mind or his head?

A. Yes, there was one remark. At that time, I felt that that remark was a sickness in which he believed that people are controlling his mind and then making him sick." (T. p. 19)

And continuing:

"Q. Now, as a result of your interview, Dr. Oh, and in view of his history that you obtained from him and your observations of him, can you tell us, medically speaking, what his condition is mentally?

A. I believe he's suffering from a mental illness. The correct diagnosis will be schizophrenia.

Q. Schizophrenia.

A. And, consequently, I believe his related unacceptable act is a direct result of a mental illness. That's what I believe.

Q. Do you consider him psychotic?

A. Yes, I do.

Q. Do you feel that he has paranoid delusions?

A. Yes.

Q. And can you tell us what his attitude is, generally speaking, as a result of your observations and interview with him?

A. His attitude was generally evasive and cool and mostly unconcerned about surroundings, even though he had expressed severe anxiety related to his belief and his experience of being controlled by other people, which is not the usual feelings a normal person can have.

Q. From your interview with him, were you able to determine whether he's suffering from hallucinations?

A. I believe that he was suffering from hallucinations occasionally.

Q. I believe you mentioned before about homicidal ideation, Dr. Oh.

A. Yes.

Q. Did the patient admit symptoms of this to you in his interview?

A. Yes, he did.

Q. In what respect?

A. That idea was expressed as a kind of survival or self-survival games. In other words, he thought that others were hurting him, so to prevent it, he has to kill the person that survives.

Q. So that your diagnosis was that of schizophrenia; is that correct?

A. Yes.

Q. Is it your opinion that he has been suffering from the psychosis for some time?

A. Yes.

Q. What is your recommendation, Doctor, with respect to his illness?

A. I have known him about eight months already very closely. In the meantime, I had attempted to help him in the community, but he showed no respect in helping himself, and he didn't keep the appointment to be treated. And even I had to call him personally on several times. He never really had gotten to the office to receive the treatment. And like in Easton Hospital at that time when he was court committed for the treatment, he had eloped from the Easton Hospital. But at that time he put himself in danger by jumping off the wall, even though there was police—he was arrested by police at that point, and we had sent him to Allentown State Hospital. However, it did not help his condition. So I felt that our effort to treat him in a most unrestrictive involvement had failed with him. Therefore, I recommended him to be treated at a more secure involvement, where he can receive treatment, involuntarily. Mainly, because he never showed any motivation to get help himself in the past.

Q. In your opinion, Doctor, do you consider him a clear and present danger to himself and to others?

A. Yes, I do." (T. pp. 20–23)

On cross-examination, Dr. Oh related:

"THE COURT: No, Doctor, I would like to make it a specific example. I want to know what was different in his condition between the times you examined him in January and April, 1977 and July of 1977. What were the differences in his conditions at those two times? That's the question.

A. At that time, he did not exhibit intense delusional symptoms and, also, he had shown no suicidal or

dangerous ideation, which I felt was not a ground to commit him to the mental institution. However, in the subsequent examination he had shown the symptoms, which showed that there is the ground for commitment to the mental institution.

Q. Specifically what?

A. In which case?

Q. In the latter case.

A. In the latter case?

Q. Yes.

A. As I had testified already, he had shown acute psychotic symptoms in which he had lost his ability to test reality, and also, due to this, he had shown that he might place himself in danger to himself and others."

Dr. Oh then testified that he had no personal knowledge that within the past thirty (30) days Appellant had engaged in conduct to indicate that he had inflicted or had attempted to inflict serious bodily harm on himself or another and that there was a reasonable probability that that conduct would likely be repeated.

Dr. Marjorie G. Morrison, Appellant's examining physician at Allentown State Hospital in January and February of 1977. Dr. Morrison testified:

"Q. If an individual would set fire, like you testified here this morning, or designed a weapon out of a coat hanger, would that, in your opinion—would that change your opinion at all as to his mentality?

A. No, because this is what he's done all his life.

Q. I see. Don't you consider that serious?

A. Yes, certainly it's serious. He can be dangerous to other people." (T. p. 38)

Finally, Dr. Barrett testified that he conducted an examination of Appellant on August 18, 1977, and related:

". . . He said that 'If I didn't see the ink, something would have happened,' which I feel was a significant type of comment. He indicated that he had requested to be

locked up in the prison for a week. He denied setting a fire, which made it difficult to discuss that reported incident. He said he has heard voices at times talking about a black and white revolution, and other than that he doesn't remember. He said that he had some thoughts about someone trying to kill him, but he didn't believe this now. And he did not seem at all upset during the interview. He basically appeared as he appears here this morning, not apparently upset." (T. p. 42)

Dr. Barrett concluded:

"I think that it's a close question as to whether he has to be hospitalized. I think it's a close question whether he ought to be considered mentally ill and antisocial . . And I feel that the main thing is that he should be confined. Whether or not he goes to Fairview is secondary to me, and I think it's a close question." (T. p. 45)

And when asked for his professional opinion if he considered Appellant dangerous to himself or to others, Dr. Barrett responded:

"Q. I see. Do you consider him dangerous to himself or to others?

A. I would consider—I would not consider himself dangerous—primarily dangerous to himself. I would consider him to be somewhat dangerous to others. I think that he has a long history of antisocial behavior which involves fighting and attacking people and so on. So I would consider him to be a relatively dangerous person, but not necessarily on the basis of psychosis, but rather when he gets frustrated, and he has a limited number of ways to respond to this. And on that basis, I would consider him to be dangerous." (T. p. 50)

Following the conclusion of the hearing, the lower court ordered Appellant committed involuntarily to Farview State Hospital for a period not to exceed ninety (90) days. In support of its commitment order, the lower court filed the following Memorandum Opinion under date of October 4, 1977, pursuant to Pa.R.A.P.1925, which held:

■■■■■■■■■■■■■■■■

"MEMORANDUM OPINION

This Memorandum Opinion is filed pursuant to Pa.R.A.P. 1925 in support of the following Order of Court:

"AND NOW, this 26th day of August, 1977, upon consideration of all of the testimony heard on August 25, 1977, and the applicable law, the Court is convinced beyond a reasonable doubt that Russell Gibson is mentally ill as that term is defined in the Mental Health Act; that without high doses of medication and a totally confined environment he is a clear and present danger to himself and/or to other persons; and that his care and treatment require commitment to a secured mental institution, namely Farview State Hospital."

A review of the record indicates that this young man has been in trouble for almost ten years and has been subjected to various studies. After considering the testimony of the various physicians who testified at the hearing held on August 25, 1977, the Court accepted the opinion of Dr. Oh that Mr. Gibson was mentally ill as defined by the Mental Health Act, was unable to control himself outside of a totally structured environment, and that the least restrictive institution available for his care and treatment is Farview State Hospital. Hence, our Order.

BY THE COURT,"

■ Appellant contends in the instant appeal that the lower court erred in its commitment order because there was insufficient evidence to prove that Appellant presented "a clear and present danger to himself or to others", as required by the Mental Health Procedures Act.

We disagree with Appellant's contention and, therefore, affirm the lower court's order certifying Appellant's involuntary commitment to Farview State Hospital.

Following a careful review of the entire record of the proceedings of the instant case, we find that there was clear and convincing evidence to demonstrate that the Appellant was suffering from a severe mental disability as defined in the Mental Health Procedures Act; that as a result of his

mental illness, Appellant's capacity to exercise self control, judgment and discretion in the conduct of his affairs and social relations, or to care for his own personal needs, was so lessened that he posed a clear and present danger of harm to others or to himself; and that Appellant's involuntary commitment to Farview State Hospital was the "least restrictive alternative" available to Appellant.

The record demonstrates that Appellant posed a clear and present danger to others as well as to himself. The two incidences related by Messrs. Flyte and Grucela—lighting the newspaper on fire in his cell—and carrying a structured handmade weapon made out of a coat hanger—certainly justify and substantiate the lower court's implicit conclusion that Appellant posed a clear and present danger to others; moreover, Dr. Oh's testimony that Appellant was "not comprehending realities", "hearing things from other sources", "believed that people are against him and want to kill him and he, in turn, had to kill them", "that Appellant suffered from hallucinations occasionally", and that Appellant "had shown acute psychotic symptoms in which he had lost his ability to test reality", all, when considered together, substantiate the lower court's finding that Appellant posed a clear and present danger to himself and, therefore, the Court's implicit conclusion that there is a reasonable probability that Appellant would suffer death or serious bodily injury within thirty (30) days unless adequate treatment were afforded under the Act.

It is interesting to note that the two other psychiatrists who testified on behalf of Appellant—Drs. Morrison and Barrett—both concluded that Appellant should be confined—albeit in a penal or mental institution. Dr. Morrison in fact did feel, based on her examination of Appellant, that she considers Appellant to be dangerous to other people.

■ Appellant next posits that the Court did not give full consideration to any "less restrictive alternative" before imposing involuntary in-patient treatment upon Appellant. The record of the proceedings when considered in light of Appellant's psychiatric history and his total lack of coopera-

tion within the mental health system of Northampton County, leads this Court to conclude that the lower court in its commitment order did in fact consider "less restrictive alternatives" for Appellant, but then rejected same.

For the above stated reasons, this Court feels that the lower court acted properly in granting the prayer of the Section 304(c) Petition for the involuntary commitment of Appellant to Farview State Hospital for a period not to exceed ninety (90) days and, therefore, we affirm the lower court's order certifying Appellant's involuntary commitment to Farview State Hospital under date of August 26, 1977.

Order affirmed.

The above case was decided prior to the retirement of HOFFMAN, J.

HOFFMAN, J., files a dissenting opinion, in which SPAETH, J., joins.

HOFFMAN, Judge, dissenting:

Appellant contends that the lower court erred in affirming his involuntary commitment to Farview State Hospital because the evidence was insufficient to prove that appellant presented a clear and present danger of harm to others or to himself as required by the Mental Health Procedures Act of 1976. I agree and, therefore, would grant appellant's petition of habeas corpus.[1]

The facts giving rise to the instant case are not in dispute. On January 14, 1977, following disruptive and threatening behavior at a youth home, appellant was admitted to Easton Hospital under § 302 of the Mental Health Procedures Act of 1976[2] [The Act] for a period of not more than 20 days.

1. The Mental Health Procedures Act is silent on the issue of appellate jurisdiction. Because appellee does not challenge our jurisdiction, we may consider the merits of the instant appeal. Pa.R.App.P. 741; 42 Pa.C.S. § 741.

2. The Act of July 9, 1976, P.L. 817, No. 143, § 101; 50 P.S. § 7302 provides, in pertinent part:

While at Easton Hospital, appellant was examined by Dr. Oh until January 15, 1977, when appellant eloped. On January 19, 1977 appellant was admitted to Allentown State Hospital[3] for continued examination under § 303 of the Act.[4] While at Allentown State Hospital, appellant was examined until February 3, 1977, by Dr. Morrison who recommended an out-patient program at the Mental Health/Mental Retardation Clinic in Easton, Pennsylvania. On March 21, 1977, appellant was arrested and charged with criminal attempt to commit arson[5], burglary[6], and criminal mischief.[7] On June 28, 1977, appellant entered a plea of guilty to the charges of criminal trespass[8] and criminal mischief in the Northampton County Court of Common Pleas; the Commonwealth dropped the charge of attempted arson at the preliminary

"Involuntary emergency examination and treatment authorized by a physician—not to exceed seventy-two hours.

"(a) Application for Examination.—Emergency examination may be undertaken at a treatment facility upon the certification of a physician stating the need for such examination; or upon a warrant issued by the county administrator authorizing such examination: or without a warrant upon application by a physician or other authorized person who has personally observed conduct showing the need for such examination."

3. The commitment order of January 14, 1977 provided for appellant's transfer to Allentown State Hospital in the event that he eloped.

4. Section 303 of the Act provides in pertinent part:
"(a) Persons Subject to Extended Involuntary Emergency Treatment.—Application for extended involuntary emergency treatment may be made for any person who is being treated pursuant to section 302 whenever the facility determines that the need for emergency treatment is likely to extend beyond 72 hours. The application shall be filed forthwith in the court of common pleas, and shall state the grounds on which extended emergency treatment is believed to be necessary. The application shall state the name of any examining physician and the substance of his opinion regarding the mental condition of the person."

5. The Crimes Code, Act of December 6, 1972, P.L. 1482, No. 334, § 1; 18 Pa.C.S. § 3301.

6. The Crimes Code, *supra*; 18 Pa.C.S. § 3502.

7. The Crimes Code, *supra*; 18 Pa.C.S. § 3304.

8. The Commonwealth reduced the burglary charge to criminal trespass.

hearing. At the close of the guilty pleas proceeding, the lower court deferred sentencing and ordered a complete psychiatric and psychological evaluation as part of appellant's pre-sentence report. Appellant then returned to Northampton County Prison to await sentencing. According to a report filed with the court by Dr. Oh, a court appointed psychiatrist, appellant was severely mentally disabled and in need of continuous treatment.

On July 26, 1977, the Warden of Northampton County Prison filed a petition for involuntary commitment of appellant pursuant to § 304 of the Act.[9] Following a hearing before the Mental Health officer of Northampton County on August 2, 1977,[10] the court ordered appellant involuntarily committed to Farview State Hospital for a period of not more than 90 days. Appellant petitioned for a review of the hearing officer's decision and for a new hearing before a judge.[11] The court granted the petition and held a hearing on August 25, 1977.

**9.** Section 304(c) of the Act provides, in pertinent part:

"*Procedures for Initiating Court-ordered Involuntary Treatment for Persons not in Involuntary Treatment.*—(1) Any responsible party may file a petition in the court of common pleas requesting court-ordered involuntary treatment for any person not already in involuntary treatment for whom application could be made under subsection (a).

"(2) The petition shall be in writing upon a form adopted by the department and shall set forth facts constituting reasonable grounds to believe that the person is within the criteria for court-ordered treatment set forth in subsection (a). The petition shall state the name of any examining physician and the substance of his opinion regarding the mental condition of the person."

**10.** Section 304 of the Act provides, in pertinent part:

"(e) Hearings on Petition for Court-ordered Involuntary Treatment. —A hearing on a petition for court-ordered involuntary treatment shall be conducted according to the following: . . .

"(6) The hearing shall be conducted by a judge or by a mental health review officer and may be held at a location other than a courthouse when doing so appears to be in the best interests of the person."

**11.** Section 303(g) of the Act provides:

"*Petition to Common Pleas Court.*—In all cases in which the hearing was conducted by a mental health review officer, a person made subject to treatment pursuant to this section shall have the right to petition the court of common pleas for review of the certifi-

At the hearing, Donald Flyte, a correction officer at Northampton County Prison, testified that on July 15, 1977, he entered appellant's cell and observed a folded up newspaper, one quarter of which was burning. Appellant stamped out the fire and threw out the newspaper. Flyte testified that there were no other inmates in the vicinity of appellant's cell. He further testified that "[appellant] is erratic. There are days when he's calm and there are other days when he seems disturbed or bothered. There are times when [appellant] could be dangerous to himself or others. At certain times . . . I mean it could be one day, yes, and the other day, no . . . it's not a set pattern."

Ludwig Grucela, Supervisor of Northampton County Prison testified that he had known appellant for about three years. He recalled that on July 15, 1977, Flyte reported the incident of the burning newspaper to him. He further testified that on July 25, 1977, a prison officer brought him a twisted coat hanger which the officer found on appellant's person while doing a routine search of appellant. Grucela stated that although he did not know if appellant had attempted to use the hanger as a weapon, "it would be a very, very vicious weapon if you got it in the stomach." [12] Grucela concluded that based on his observations, he was of the opinion that appellant "might injure someone else or himself."

Next, the lower court heard the testimony of Dr. Oh who stated that on July 19, 1977, he examined appellant pursuant to the June 28, 1977 court order directing appellant's psychiatric evaluation. Dr. Oh testified that in his opinion, appel-

cation. A hearing shall be held within 72 hours after the petition is filed unless a continuance is requested by the person's counsel. The hearing shall include a review of the certification and such evidence as the court may receive or require. If the court determines that further involuntary treatment is necessary and that the procedures prescribed by this act have been followed, it shall deny the petition. Otherwise, the person shall be discharged."

12. Appellant's attorney objected to Grucela's statements about the burning newspaper and twisted hanger as being hearsay. The lower court overruled the objections and admitted the testimony. Because of our disposition of the instant case, it is unnecessary for us to consider appellant's hearsay contention. See note 18, infra.

lant "was suffering from mental illness, so-called, with the symptoms of psychosis, and he showed a very suspicious attitude and behavior along with symptoms that he was not able to control himself at that time." Specifically, Dr. Oh stated that in the course of the 45 minute interview, appellant indicated that "he was hearing things from other sources which was not from himself, and he also believed that people are against him and he, in turn, had to kill them." Dr. Oh further testified that he had read appellant's psychiatric record and had prior personal contact with appellant during which time he formed the opinion that appellant was schizophrenic, psychotic, paranoid, and suffered from hallucinations. Although Dr. Oh stated that he had heard about the burning newspaper in appellant's cell, he offered no testimony linking this incident with his psychiatric evaluation of appellant. On cross-examination, the following interchange ensued:

"[APPELLANT'S COUNSEL]: Doctor, within the past 30 days, what conduct has this man engaged in to indicate that he has inflicted or attempted to inflict serious bodily harm on himself or another and that there's a reasonable probability that that conduct will be repeated?

"DR. OH: I have no information besides I have seen him on July 19th and the information I had through the last commitment court hearing, which you were there."

Dr. Oh concluded that attempts to treat appellant in an unrestrictive environment had failed, that Northampton County Prison was not equipped to handle appellant, and that appellant's lack of motivation in obtaining help indicated a need for involuntary commitment.

Appellant presented the testimony of two psychiatrists. Dr. Morrison examined and treated appellant at Allentown State Hospital after his 20 day commitment under § 303 of the Act[13] in January or February of 1977. Dr. Barrett examined and treated appellant on August 18, 1977. Both psychiatrists agreed that appellant's age, history, and unsuc-

13. *See* note 4, *supra.*

cessful experiences with psychiatric counseling indicated that confinement in a correctional facility within the criminal justice system, as opposed to a psychiatric hospital, would be more beneficial to appellant. Neither psychiatrist testified that the burning newspaper or bent coat hanger related to appellant's mental condition.

Following the hearing, the lower court judge ordered appellant committed to Farview. This petition for habeas corpus followed.

Appellant contends that the lower court erred in ordering his involuntary commitment to Farview because there was insufficient evidence to prove that he presented a clear and present danger either to himself or to others as required by the Mental Health Procedures Act. Section 304 of the Act provides, in pertinent part:

"Court-ordered involuntary treatment not to exceed ninety days

"(a) Persons for Whom Application May be Made.—(1) A person who is severely mentally disabled and in need of treatment, as defined in section 301(a), may be made subject to court-ordered involuntary treatment upon a determination of clear and present danger under section 301(b)(1) (serious bodily harm to others), or section 301(b)(2)(i) (inability to care for himself, creating a danger of death or serious harm to himself), or 301(b)(2)(ii) (attempted suicide), or 301(b)(2)(iii) (self-mutilation).

"(2) Where a petition is filed for a person already subject to involuntary treatment, it shall be sufficient to represent, and upon hearing to reestablish, that the conduct originally required by section 301 in fact occurred, and that his condition continues to evidence a clear and present danger to himself or others. In such event, it shall not be necessary to show the reoccurrence of dangerous conduct, either harmful or debilitating, within the past 30 days." [footnote omitted].

Section 301 of the Act outlines the requirements for involuntary commitment:

"Persons who may be subject to involuntary emergency examination and treatment.

"(a) Persons Subject.—Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself.

"(b) Determination of Clear and Present Danger.—(1) Clear and present danger to others shall be shown by establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is a reasonable probability that such conduct will be repeated. If, however, the person has been found incompetent to be tried or has been acquitted by reason of lack of criminal responsibility on charges arising from conduct involving infliction of or attempt to inflict substantial bodily harm on another, such 30-day limitation shall not apply so long as an application for examination and treatment is filed within 30 days after the date of such determination or verdict. In such case, a clear and present danger to others may be shown by establishing that the conduct charged in the criminal proceeding did occur, and that there is a reasonable probability that such conduct will be repeated.

"(2) Clear and present danger to himself shall be shown by establishing that within the past 30 days:

"(i) the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act; or

"(ii) the person has attempted suicide and that there is the reasonable probability of suicide unless adequate treatment is afforded under this act; or

"(iii) the person has severely mutilated himself or attempted to mutilate himself severely and that there is the reasonable probability of mutilation unless adequate treatment is afforded under this act."

In addition, § 304(f) provides that the Commonwealth must prove the existence of clear and present danger to oneself or to others by clear and convincing evidence.[14]

The statutory conditions necessary to a determination of clear and present danger require both certain conduct within 30 days prior to the mental health hearing *and* a reasonable probability that such conduct will recur. An examination of the record of the August 25, 1977 hearing demonstrates only two occurrences which arguably could fit within the statutory requirements. I do not believe that either occurrence sufficiently satisfies the standards of § 301.

Donald Flyte testified that he found a folded, partially burning newspaper in appellant's cell. However, he also testified that appellant extinguished the fire before throwing out the newspaper. Moreover, there was no testimony at the hearing of either prior or subsequent similar incidents. Finally, none of the three testifying psychiatrists offered any opinion connecting the incident with appellant's mental condition. Without more, a single incident of possessing a partially burning newspaper is insufficient to demonstrate that appellant had "inflicted or attempted to inflict serious bodily harm on another and that there is reasonable probability that such conduct will be repeated." Section 301(b)(1). Nor is the evidence sufficient to prove

14. Section 7304(f) of the Act provides:

"Determination and Order.—Upon a finding by clear and convincing evidence that the person is severely mentally disabled and in need of treatment and subject to subsection (a), an order shall be entered directing treatment of the person in an approved facility as an inpatient or an outpatient. Inpatient treatment shall be deemed appropriate only after full consideration has been given to less restrictive alternatives. Investigation of treatment alternatives shall include consideration of the person's relationship to his community and family, his employment possibilities, all available community resources, and guardianship services. An order for inpatient treatment shall include findings on this issue."

that appellant had "severely mutilated himself or attempted to mutilate himself severely and that there is reasonable probability of mutilation unless adequate treatment is afforded under this act." § 301(b)(2)(iii). Consequently, I would hold that the burning newspaper incident did not constitute clear and convincing evidence that appellant was a clear and present danger to himself or others.[15]

The second event arguably within the requirement of § 301 concerned the bent hanger which a prison officer purportedly found on appellant's person. At the hearing, Supervisor Grucela stated that the prison officer had told him that the hanger was bent in the shape of a weapon. However, there was no testimony that appellant either used, attempted to use, or threatened to use the hanger to injure himself or others. Nor was there any psychiatric testimony that demonstrated that appellant's psychosis would lead him to use the hanger as a weapon. Consequently, I would conclude that this event also fails to satisfy the statutory requirements of clear and present danger. §§ 301(b)(1) and (b)(2)(iii).[16]

I would conclude that the Commonwealth failed to prove by clear and convincing evidence that appellant was a clear and present danger to himself or others. Because there was insufficient evidence to commit appellant involuntarily under the Act, I believe that the lower court erred in issuing its commitment order.[17] Accordingly, I would grant appel-

15. An examination of the statutory requirements for commitment demonstrates that appellant's conduct did not satisfy any other statutory condition permitting involuntary commitment, e. g., adjudication of incompetency or suicide attempt. *See* Mental Health Procedures Act; 50 P.S. § 7301(b)(1) and (2)(ii). Further, although Grucela testified vaguely about having problems with appellant taking his medicine regularly he was not specific about when these problems occurred or the nature and extent of the difficulties. Thus, I would conclude that there was insufficient evidence to establish that appellant's welfare was seriously endangered pursuant to § 7301(b)(2)(i).

16. Note 15, *supra*.

17. In its order, the lower court did not explain how the Commonwealth's evidence satisfied any of the statutory requirements.

lant's petition for habeas corpus and remand to the lower court for appropriate action.

SPAETH, J., joins in this Dissenting Opinion.