J-S20014-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.T.B. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 115 MDA 2021 |

Appeal from the Order Entered January 13, 2021
In the Court of Common Pleas of Centre County Civil Division at No(s):
20-3107

BEFORE: NICHOLS, J., KING, J., and MUSMANNO, J.

MEMORANDUM BY NICHOLS, J.:          **FILED: AUGUST 16, 2021**

Appellant M.T.B. appeals from the order involuntarily committing him for psychiatric treatment with Appellee The Meadows Psychiatric Center (Meadows). Appellant challenges the sufficiency of evidence for his commitment pursuant to 50 P.S. § 7304. We affirm.

We state the facts as set forth by the trial court:

This matter commenced when an Application for Involuntary Emergency Treatment under [50 P.S. § 7302] of the Mental Health Procedures Act [(MHPA)] was completed on December 13, 2020 by Emily Miller, M. Ed. Ms. Miller noted that [at the time of the application,] Appellant was a patient at [the Meadows] with a 72 hour notice.[1] Appellant was originally in the Meadows voluntarily for treatment. Appellant continued to report hearing voices and was vague with his treatment providers about the voices, stating, "I'm listening." Within the prior thirty (30) days, it was noted Appellant hit his roommate and it was discovered he possessed a

_____

[1] **See** 50 P.S. § 7203 (stating that a person may be accepted for voluntary in-patient treatment for up to 72 hours).

knife in his belongings. Appellant told his treatment providers he could have pulled the knife out. [The assault and discovery of Appellant's knife occurred between December 10 and 13, 2020. *See* § 7302 Application, 12/13/20; *see also* § 7303 Application, 12/18/20.] Ms. Miller noted Appellant was refusing all medications, had no insight into treatment, and was a danger to himself and others. Dr. Anokwuru[2] completed the physician's examination portion of the [Section 7302] application. He noted that Appellant is a 30 year-old male with a diagnosis notable for paranoid schizophrenia and unspecified mood disorder. He was admitted for suicidal behavior and presented with greatly limited insight and a labile mood with impulsivity and unpredictability. In the treatment needed section, Dr. Anokwuru indicated Appellant required medication management to help stabilize his mood. [The Section 7302 application was granted on December 13, 2020].

An Application for Extended Involuntary Treatment under [50 P.S. § 7303] was filed in this matter on December 18, 2020. In the Physician's Examination part of the application, the physician wrote, the patient presented to the Meadows on December 10, 2020 with thoughts of killing himself and possibly others. A knife was found with his possessions and he stated if he left the hospital, he would return immediately and would pull his knife on someone. [*See* § 7303 Application, 12/18/20.] Appellant was diagnosed with severe borderline personality disorder with psychosis and paranoid schizophrenia. Appellant was refusing to take his prescribed medications. The treatment needed was Haldol with Benadryl, group therapy, and supportive counseling. It was further noted that Appellant would need help coping with his homelessness and limited family support. The physician indicated by checking the relevant box that the patient continued to be severely mentally disabled and in need of involuntary inpatient treatment, outpatient, partial hospitalization, or a combination.

[On December 18, 2020, the mental health review officer, Sonja Napier, Esq., filed a certification finding] Appellant to be severely mentally disabled and in need of involuntary treatment. She [also certified that Appellant] be committed to inpatient treatment at

_____

[2] Dr. Anokwuru's first name was not in the record.

the Meadows Psychiatric Center or a designated treatment facility for a commitment period not to exceed twenty (20) days.[3]

Appellant's need for inpatient treatment persisted and on January 5, 2021, [the Meadows] filed a [50 P.S. § 7304] Application seeking continued involuntary inpatient treatment. Dr. Orlando Davis, M.D. completed the Results of Examination portion of the application. Dr. Davis noted Appellant was admitted with severe borderline psychosis, marked ambivalence, rambling speech, guarded nature, and was refusing to take his medication regularly. He further noted Appellant was unable to speak in a manner that made sense or was realistic about his discharge plans or housing options and continued to be unable to provide for his own welfare and safety. Dr. Davis further noted medication was started over Appellant's objection with a second physician opinion having been obtained.

Trial Ct. Op., 3/16/21, at 1-3 (formatting altered).

On January 5, 2021, a hearing pursuant to Section 7304(b) was held before Attorney Napier. *See* 50 P.S. § 7304(b), (e)(6). The trial court summarized the hearing as follows:

Participating in the hearing were the Appellant; Dr. Orlando Davis, M.D., the psychiatrist for the Meadows; David Crowley, Esquire, Appellant's attorney via speakerphone; Mary Ann Kresan, Esquire, the attorney for the Meadows via speakerphone; and [Attorney] Napier, the Mental Health Review Officer, via speakerphone. Dr. Davis is a psychiatrist and the Medical Director of the Meadows Psychiatric Center. Dr. Davis was the treating physician for Appellant and had examined Appellant in connection with the [Section 7304] hearing. Dr. Davis testified that since the [Section

_____

[3] The trial court, on December 21, 2020, entered an order "finding Appellant to be in need of inpatient treatment pursuant to [50 P.S. § 7303] and ordered that Appellant be committed to inpatient treatment at the Meadows Psychiatric Center or other designated, approved facility for a period not to exceed twenty (20) days." Trial Ct. Op. at 3 (some formatting altered). The trial court's order was unnecessary for a Section 7303 application, as certification by the mental health review officer was sufficient. *See* 50 P.S. § 7303(e).

7303] proceeding, Appellant continued to be diagnosed with borderline psychosis and paranoid schizophrenia. He was unable to provide for his basic needs including health, safety, welfare, and nutrition without the assistance he was receiving. He was lacking housing and unable to provide for his own survival including food and shelter and was unable to communicate his needs coherently to others. Appellant was not fully compliant with his medications as he was, at times, declining to take the medication prescribed -- Haldol and Benadryl. Appellant was on appropriate doses of the medications but Dr. Davis needed to determine if the doses needed to be adjusted once Appellant was actually compliant with taking the medication as prescribed. Appellant was offered growth therapy and supportive therapy in which he had participated. He was also provided psychotherapy and supportive case management in which he partially participated because Appellant was unable to identify a place he could live when he would leave the hospital. Due to his housing issues, his next level of care could not be determined. Dr. Davis testified there was a reasonable probability of death, disability, or serious physical debilitation within thirty (30) days if Appellant was not subject to further involuntary inpatient treatment.

Dr. Davis was specifically concerned Appellant would return quickly to the Meadows if further inpatient treatment was not provided, based on Appellant's behavior demonstrated in the past when Appellant returned to the Meadows very soon after he was discharged.[4] Upon returning, Appellant had a knife in his possessions which was later disclosed and he had ideas that he might want to kill himself. [N.T. Hr'g, 1/5/21, at 16.] He was ambivalent and speculated he might pull the knife when he would come back again after being discharged. Dr. Davis noted if he could not work with Appellant to find him a place to live where Appellant will receive the necessary ongoing treatment, Appellant's behavior was likely to continue upon release.

Dr. Davis further noted Appellant was a clear and present danger as he was on "aggression precautions" since he struck another

---

[4] The record does not establish when, if at all, Appellant was discharged. It appears Dr. Davis was referring to the events of December 10-13, 2020, when Appellant indicated that **if** he left the Meadows, he would return and "would pull his knife out on someone." **See** § 7303 Application.

person in his room. [Dr. Davis testified that] Appellant had not struck another person for "some time," so he would likely be released soon from aggression precautions. [N.T. Hr'g at 13.] In connection with his aggression, Dr. Davis stated if Appellant takes his medication properly, he anticipates that will allow Appellant to communicate better so he is better understood to enable Appellant to get help and treatment services once released.

Dr. Davis was seeking continued inpatient treatment which was the least restrictive treatment option for Appellant, which treatment would include medication management, therapies as appropriate, discharge planning, and assistance with accessing community resources. Appellant was in opposition to the medication prescribed and Dr. Davis noted the hospital got a second opinion from a physician regarding medication. The doctor also stated that Appellant's improvement was extremely slow because of his ambivalence and because he was only willing to take medication at times. At other times, he would hear voices and talk of having been lobotomized years ago at the Meadows.

Trial Ct. Op. at 4-6 (formatting altered); *see* N.T. Hr'g at 1-28.

Appellant also testified at the Section 7304 hearing, but his testimony was frequently incoherent and nonresponsive. Appellant admitted to striking another person and disagreed with his schizophrenia diagnosis. N.T. Hr'g at 20-21, 27-28. Appellant "was working on" a place to live with family, but "was not too sure," but he did not testify about any definitive housing options. *Id.* at 22-23. Appellant asserted that he did not want to be involuntarily committed but wanted to work with the Meadows. *Id.* at 25. Appellant did not testify about the knife or harming himself or others.

Based upon the Section 7304 hearing, Attorney Napier filed a report on January 5, 2021, which concluded, in part, as follows:

1. It was shown by clear and convincing evidence, that [Appellant] is severely mentally disabled within the meaning of [50 P.S. §

7304]. As a result of mental illness [Appellant] is a danger to himself and others.

2. Inpatient treatment at the Meadows . . . is the least restrictive treatment to treat [Appellant] adequately.

Report, 1/5/21, at 3 (unpaginated).

On January 13, 2021, the trial court reviewed Attorney Napier's report, stated it was "satisfied by clear and convincing evidence that [Appellant was] in need of inpatient treatment pursuant to" Section 7304 and ordered Appellant committed to inpatient treatment for up to ninety days at the Meadows.[5] Order, 1/13/21.

On January 21, 2021, Appellant filed a timely notice of appeal from the January 12, 2021 order.[6] Notice of Appeal, 1/21/21. Appellant also timely filed a court-ordered Pa.R.A.P. 1925(b) statement.

Appellant raises the following issue:

Did the government lack sufficient evidence to involuntarily commit Appellant to involuntary psychiatric treatment as it failed to present clear and convincing evidence of conduct supporting a reasonable probability that death or serious physical debilitation or bodily injury were likely imminent if he were not forced into treatment?

_____

[5] In sum, prior to the January 12, 2021 order, Appellant was subject to voluntary treatment for three days, involuntary treatment for five days pursuant to a Section 7302 application, and involuntary treatment for twenty days pursuant to a Section 7303 application.

[6] A post-trial motion is not required to preserve issues for appeal. *In re K.L.S.*, 934 A.2d 1244, 1249 (Pa. 2007). We add that even if Appellant has been released from the involuntary ninety-day treatment period, the appeal is not moot. *See In re R.D.*, 739 A.2d 548, 553 (Pa. Super. 1999).

Appellant's Brief at 4.

Appellant argues that the Meadows "did not present clear and convincing evidence that involuntary psychiatric treatment was necessary to avoid likely death, serious bodily injury, or serious physical debilitation." *Id.* at 14 (referencing Section 7301(b)(2)(i)). In Appellant's view, the Meadow's evidence was "sheer speculation that his inability to acquire housing would likely cause him to use a knife to kill himself or another." *Id.*

Appellant summarizes *Com. ex rel. Gibson v. DiGiacinto*, 439 A.2d 105 (Pa. 1981) (*Gibson II*), *rev'g*, 395 A.2d 938 (Pa. Super. 1978) (*Gibson I*), and argues that the *Gibson II* Court reversed an involuntary commitment based on insufficient evidence that the patient "posed a clear and present danger to himself and others." Appellant's Brief at 14. Appellant compares the facts of his case to the facts in *Gibson II*, and he asserts that the facts in *Gibson II* were even more egregious than the facts of his case.

This Court reviews determinations pursuant to the MHPA to "determine whether there is evidence in the record to justify the [hearing] court's findings." *In re S.M.*, 176 A.3d 927, 935 (Pa. Super. 2017) (citation omitted). This Court is "not bound by the hearing court's legal conclusions and must reverse if the evidence does not justify the hearing court's decision." *Gibson II*, 439 A.2d at 107 (citations omitted).

We briefly summarize the MHPA:

The MHPA provides for involuntary emergency examination and treatment of persons who are "severely mentally disabled and in

- 7 -

need of immediate treatment." 50 P.S. § 7301(a). It then authorizes increasingly long periods of commitment for such persons, balanced by increasing due process protections in recognition of the significant deprivations of liberty at stake. Accordingly, in applying the MHPA, we must take a balanced approach and remain mindful of the patient's due process and liberty interests, while at the same time permitting the mental health system to provide proper treatment to those involuntarily committed to its care.

**S.M.**, 176 A.3d at 930-31 (some citations omitted and formatting altered).

Section 7301(a) explains when a mentally disabled person may be subject to involuntary treatment:

Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself, as defined in [50 P.S. § 7301(b) . . .].

50 P.S. § 7301(a).

Section 7301(b)(1) defines clear and present danger of harm to **others**, and Section 7301(b)(2) defines clear and present danger of harm to **himself**, in relevant part as follows:

(1) . . . . For the purpose of this section, a clear and present danger of harm to others may be demonstrated by proof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm.

(2) Clear and present danger to himself shall be shown by establishing that within the past 30 days:

(i) the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment,

- 8 -

personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act; . . . .

50 P.S. § 7301(b)(1), (2)(i).

Section 7304 permits court-ordered involuntary treatment for up to ninety days. *Id.* § 7304(g). Section 7304(a)(2) states the criteria for involuntary treatment of a person that is currently subject to involuntary treatment:

(2) Where a petition is filed for a person already subject to involuntary treatment, it shall be sufficient to represent, and upon hearing to reestablish, that the conduct originally required by section [7301(b)] in fact occurred, and that his condition continues to evidence a clear and present danger to himself or others . . . . In such event, it shall not be necessary to show the reoccurrence of dangerous conduct, either harmful or debilitating, within the past 30 days.

*Id.* § 7304(a)(2). The *S.M.* Court clarified Section 7304(a)(2) as follows:

[T]he petitioner need not relitigate the initial commitment and . . . the trial court may consider a patient's original commitment as contained in that patient's commitment history as long as the patient's commitment history shows that the requisite behavior occurred in the past. If the patient challenges that original commitment, the burden is on the patient to show that the original commitment was improper.

*S.M.*, 176 A.3d at 936 (citations omitted and formatting altered).

In sum, a Section 7304(a)(2) petitioner must prove two factors. First, the petitioner, at a hearing, must "reestablish" the patient's prior conduct, which qualified as a clear and present danger to himself, to others, or both, "in fact occurred." *See* 50 P.S. §§ 7301(b)(1)-(2), 7304(a)(2). Second, the

petitioner must establish the patient's condition continues to evidence a clear and present danger to himself or others. *Id.* § 7304(a)(2).

In *Gibson II*, the patient was in prison when the appellee filed a petition for court-ordered involuntary treatment. *See Gibson II*, 439 A.2d at 106. The appellee had to establish that the patient, within the past thirty days, was a clear and present danger to himself or others. *See id.* Specifically, the appellee had

> to show an overt act involving attempted suicide or self-mutilation or the infliction or threat of serious bodily harm to others to support the finding. In the absence of such an overt act, actions indicating inability to satisfy his own need for nourishment, personal or medical care, shelter, or self-protection and safety must be shown.

*Id.* at 107 (citations omitted). The appellee presented testimony that the patient had extinguished a burning newspaper in his prison cell, did not take scheduled doses of his medication, and "possessed a twisted piece of coathanger." *Id.* at 106; *Gibson I*, 395 A.2d at 941-44. As a result, the trial court ordered that the patient be committed involuntarily, and this Court affirmed. *Gibson II*, 439 A.2d at 105-06; *Gibson I*, 395 A.2d at 945.

The patient appealed to our Supreme Court, which held that the appellee did not establish that the patient was a clear and present danger to himself or others. *Gibson II*, 439 A.2d at 107. In the *Gibson II* Court's view, there was no evidence that (1) the patient deliberately set the newspaper on fire, (2) the patient's behavior was changed as a result of not taking his medication; and (3) the patient "used or threatened to use" the coathanger

to injure himself or others. ***Id.*** The ***Gibson II*** Court concluded that because the record did not establish "an overt act involving attempted suicide or self-mutilation or the infliction or threat of serious bodily harm to others," or the patient's inability "to attend to his needs as to threaten death [or] serious bodily injury," the ***Gibson II*** ordered that the patient be released. ***Id.***

Here, as set forth above, Appellant argues that the Meadows presented insufficient evidence that he posed a clear and present danger to himself. ***See*** Appellant's Brief at 14. The Meadows, however, presented testimony that in early December 2020, a knife was discovered in Appellant's belongings and that "he might want to kill himself." ***See*** N.T. Hr'g at 11; Trial Ct. Op. at 4-6. Therefore, the instant record is unlike the record in ***Gibson II***, in which no evidence was presented that the patient "used or threatened to use" the coathanger to injure himself. ***See Gibson II***, 439 A.2d at 107.

Dr. Davis also testified that Appellant was diagnosed with severe mental illness and was unable to provide for his own welfare and safety, including shelter. ***See*** N.T. Hr'g at 13, 16; Trial Ct. Op. at 3. In contrast, in ***Gibson II***, the issue of the patient's shelter was not at issue since the patient was in prison. ***See Gibson II***, 439 A.2d at 107. Here, Appellant has been unable to acquire housing and did not testify that he had definitive housing options, which was not an issue in ***Gibson II***. ***Compare*** N.T. Hr'g at 22-23, ***with Gibson II***, 439 A.2d at 107.

Finally, although Appellant disagreed with his schizophrenia diagnosis, Appellant did not present any other testimony disputing Dr. Davis's testimony. *See* N.T. Hr'g at 20-21, 27-28. For these reasons, we disagree with Appellant's argument that the Meadows did not present clear and convincing evidence of Appellant's clear and present danger to himself, including self-harm and inability to satisfy his need for shelter. *See* Appellant's Brief at 14; 50 P.S. § 7301(b)(2)(i). Therefore, Appellant's reliance on *Gibson II* fails.

Most importantly, the record supports the trial court's finding that Appellant is a clear and present danger to others, which satisfies the statutory requirements for a Section 7304(a)(2) commitment. Both the Meadows and Appellant presented testimony that Appellant struck his roommate in early December 2020. *See* N.T. Hr'g at 11, 20; Trial Ct. Op. at 4-6. The Meadows also presented testimony that Appellant was ambivalent about killing someone else, he possessed a knife in his belongings, and that he might pull the knife on someone after being discharged. *See* N.T. Hr'g at 11, 16; Trial Ct. Op. at 4-6. The Meadows acknowledged that Appellant had not struck another person in "some time" and would soon be released from "aggression precautions." N.T. Hr'g at 13. Further, Meadows' witness testimony established that Appellant was not fully compliant with his medications and that he declined to take prescribed medication. *Id.* at 13, 16. Nonetheless, the record would also support a determination that Appellant's prior conduct was a clear and present danger to others, and given Appellant's opposition to

medication, Appellant would continue to pose a danger to others. ***See S.M.***, 176 A.3d at 935.

Finally, the record does not establish that the Meadows ever asserted that Appellant's "inability to acquire housing would likely cause him to use a knife to kill himself or another." ***See*** Appellant's Brief at 14. Rather, the Meadows has consistently alleged that Appellant's mental illness posed a danger to himself and others. ***See, e.g.***, Report, 1/5/21, at 3. For these reasons, we affirm the trial court's order because the record supports the trial court's findings based on clear and convincing evidence. ***See S.M.***, 176 A.3d at 935.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/16/2021