446 A.2d 976

**COMMONWEALTH of Pennsylvania,**

v.

**Ida BLAKER, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 3, 1979.

Filed Dec. 29, 1981.

Andrew F. Schneider, Assistant Public Defender, Doylestown, for appellant.

Louis Floge, Cornwells Heights, did not file a brief on behalf of participating party.

Before SPAETH, CAVANAUGH and O'KICKI, JJ.*

SPAETH, Judge:

■ This appeal is from an order entered pursuant to section 303 of the Mental Health Procedures Act, Act of July 9, 1976, P.L. 817, No. 143, as amended, 50 P.S. § 7303, committing appellant to a mental hospital for extended involuntary emergency treatment. Appellant argues that the evidence was insufficient to support the commitment.[1] We agree, and therefore vacate the order.

■ Section 301(a) of the Mental Health Procedures Act, 50 P.S. § 7301, provides that a person may be subjected to involuntary examination and treatment only if that person is so "severely mentally disabled" that he "poses a clear and present danger of harm to others or to himself." Section 301(b) provides specific, narrow, definitions of "clear and present danger":

> Clear and present danger to others shall be shown by establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is a reasonable probability that such conduct will be repeated.

---

* President Judge Joseph F. O'Kicki, of the Court of Common Pleas of Cambria County, Pennsylvania, is sitting by designation.

1. Appellant has argued other issues, but we do not reach them. The lower court expressed the view in its opinion that this appeal was moot because the order of involuntary commitment expired two days after this appeal was taken. However, because involuntary commitment affects an important liberty interest, and because by their nature most involuntary commitment orders expire before appellate review is possible, this appeal is not moot. *In re S. C.*, 280 Pa.Superior Ct. 539, 421 A.2d 853 (1980); *In re Ann S.*, 279 Pa.Superior Ct. 618, 421 A.2d 370 (1980); *Commonwealth ex rel. Bielat v. Bielat*, 257 Pa.Superior Ct. 446, 390 A.2d 1321 (1978).

Section 301(b)(1), 50 P.S. § 7301(b)(1) (in relevant part)
Clear and present danger to himself shall be shown by establishing that within the past 30 days:

(i) the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act[.]

Section 301(b)(2), 50 P.S. § 7301(b)(2) (in relevant part)
Not only are these sections narrowly drawn, we have held that the entire Act is to be construed strictly. *In re S. C.*, 280 Pa.Superior Ct. 539, 546, 421 A.2d 853, 857 (1980).

The incident giving rise to appellant's commitment occurred on April 9, 1979. Shortly before noon appellant, a woman in her middle sixties, had arrived at the Bucks County Nutrition Center, which was located about six miles from her home, in a bus driven by Jean Murphy, a driver for Bucks County Adult Services. For some reason appellant became upset and left the Center on foot. It was a rainy day and she was carrying an umbrella. Ms. Murphy went looking for her and found her about 50 yards away. When Ms. Murphy took appellant's elbow to help her into the bus, appellant struck her once with the umbrella. She then voluntarily entered the bus and was driven home.

At the informal hearing before the mental health review officer, four people testified in support of appellant's commitment: Ms. Murphy; Lewis McGrath, also apparently with Adult Services although his exact title is not in the record; Dr. John H. Houey,[2] staff psychologist at Eugenia Hospital; and Jacqueline Hancock, geriatric social coordinator at the hospital. On the basis of their testimony, the

2. According to appellant's brief, at 5, the correct spelling of the psychologist's name is "Yoo." Because it is consistently spelled "Houey" in the notes of testimony and the lower court opinion, we shall do the same.

mental health review officer found that appellant represented a clear and present danger to others.

After listening to a tape recording of the proceeding before the mental health review officer, and after hearing the argument of appellant's counsel, the lower court found that it did not agree with the officer that appellant represented a clear and present danger to others. However, the court found that she did represent a danger to herself, and on that basis, continued the officer's order of involuntary commitment in effect without change.

■ In our view, the testimony before the mental health review officer was insufficient to show that appellant represented a clear and present danger either to others, as the officer found, or to herself, as the lower court found.

The testimony concerning the incident at the Center indicated that appellant became upset, left the Center, and walked away about 50 yards. Contrary to the lower court's statement, Slip op. at 3, there was no testimony that showed she was intending to walk home, or, for that matter, that walking home would have probably resulted in "death, serious bodily injury or serious physical debilitation." The testimony indicated that appellant is a sensitive person, who is hard to deal with. She is proud, does not like to be touched by others, and because of a hearing problem, has some trouble communicating with others. She said that she did not want to take the medication the hospital was giving her because she was a Christian Scientist.

In support of its finding that appellant was a danger to herself, the lower court cited the testimony of Dr. Houey, the staff psychologist. Dr. Houey had spent a total of one hour and forty-five minutes with appellant at the hospital after her initial involuntary commitment—ten or fifteen minutes the day after she was admitted, an hour the following day, and 30 minutes the morning of the hearing. The

core of his testimony concerning appellant's danger to herself and others was as follows:[3]

Q. Do you feel at the present time she's in danger to others or herself?

A. I think more like to herself.

Q. What makes you say that?

A. She might get into trouble.

Q. I'm not sure I understand what you mean.

A. Because of suspicious problem with trusting people, I don't know, I don't know how much was delusional.

Q. Do you have any evidence of delusional behavior?

A. No, I don't think I do I try—(garbled sentence).

\* \* \* \* \* \*

Q. Well, let's take this one at a time. As far as her danger to others, specifically in instances related or referred to by Mrs. Murphy.

A. All right, she might accuse someone without any grounds, they might get into altercation or accusations.

\* \* \* \* \* \*

Q. Do you feel that she could be managed on a partial hospitalization or outpatient basis at the present time?

A. I don't think she can.

Q. Why do you say that?

A. I think she needs constant supervision, she might wander in the street, she might just walk away, not because she's disoriented, she's oriented.

Q. She is oriented?

A. She's oriented.

3. Although appellant does not raise this point, we cannot help but note that contrary to the requirement of § 303(c), 50 P.S. § 7303(c), no examining physician testified at the hearing before the mental health review officer. At times during his testimony Dr. Houey answered questions in terms of his understanding of the attending physician's diagnosis. His answer to the question, "What therapy are you recommending?" was, "Attending physician, I have to speak to attending physician. He placed her on (garbled) two capsules." N.T. 29. According to the Application for Extended Involuntary Treatment, which is part of the record, the attending physician was a Dr. Goldstein. There was no explanation for his failure to testify.

Q.  Well, what makes you think she's a danger to herself, then?

A.  She's afraid to interact with other people cause I have observed her, she doesn't socialize, she doesn't interact, when someone approaches who might ask her questions she might walk away, she started talking about unfailures [*sic*], injustices by ladies, by people, by numerous people. N.T. 30–31.

None of the witnesses at the hearing before the mental health review officer could cite any instance of appellant's ever having hit anyone other than the incident with the umbrella, much less any instance of her having caused or attempting to cause serious bodily harm to another person. Dr. Houey was not asked how the behavior he described could probably lead to "death, serious bodily injury or serious physical debilitation within 30 days," and we fail to see how it could.  There was the testimony by Murphy and McGrath that appellant had been hard to deal with for a long time and was the subject of complaints from a number of sources, but if anything, this testimony argues against a finding that her pattern of behavior was immediately life-threatening in the manner required by section 301(b)(2)(i).

Although the mental health review officer heard Dr. Houey testify that he believed that appellant needed constant supervision, her order only provided that appellant's involuntary commitment should continue for no more than ten days, and that appellant should be discharged if it were possible to arrange to have certain recommended tests done on an outpatient basis.  Given this order, and the testimony before the mental health review officer, we find ourselves in agreement with appellant's counsel, when he argued to the lower court:

I have what I perceive is the heart of the matter and that is the mental health review officer thought that [appellant] needed testing.  I myself think she needs testing but under the mental health act I don't think she is committable, I think the evidence is insufficient as to the danger to herself or others;  and at least at this point in time she

knows what her rights are and has asserted her rights.... [S]he speaks about her Christian Science beliefs and it's unclear on the record as to how they affect her as far as volunteering to get testing. I think under the Act she is simply not committable involuntarily. N.T. 48–49.

It is not enough to find, as the lower court did, that appellant "was truly in need of the services offered by [the] mental health system." Slip op. at 6. Unless one or more of the requirements of section 301, 50 P.S. § 7301, is met, involuntary commitment is not lawful. *In Re S. C., supra. See also, O'Connor v. Donaldson*, 422 U.S. 563, 575, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396 (1975).

The order of the lower court is vacated.

O'KICKI, J., files a dissenting opinion.

O'KICKI, Judge, dissenting:

On April 23, 1979, a hearing was held before the Civil Division of the Court of Common Pleas of Bucks County pursuant to Section 303(g) of the Mental Health Procedures Act, 1976, July 9, P.L. 817, No. 143, Section 101, 50 P.S. Section 7303, in which that Court reviewed the ten-day commitment of Ida Blaker under Section 303 of that Act by the Bucks County Mental Health Review Officer to Eugenia Hospital for the limited purposes of performing an EEG test and a CAT scan test. After having heard a tape of the proceedings held before the Review Officer, the Trial Court found that Mrs. Blake (Appellant) represented a clear and present danger to her own safety, and therefore affirmed the Mental Health Review Officer's Order for further involuntary treatment. That order has been appealed.

Appellant first contends that the issue before us is not moot even though her commitment order expired at the time of the adjudication. The record reflects that following the Trial Court's Order of April 23, 1979, only six days remained on the Mental Health Review Officer's original order of commitment, the order having been entered on April 19,

1979. An appeal was then filed on April 27, 1979, and notice of appeal was received by the Trial Court on April 30, 1979, at which time the commitment order had already expired.

The Trial Court, in its Opinion, did not render a decision on this issue but rather, after citing authority, and with a brief discussion upholding its mootness, decided the merits of the issues of the case by "assuming, however, that the case is not found to be moot."

The Trial Court, in its discussion of mootness, relys upon *In re Gross*, 476 Pa. 203, 324 A.2d 116 (1978) where it was held that there was nothing further to be done by the Trial Court since the Appellant was no longer an inpatient, was being treated by his own physician and was no longer being administered medication against his will (the latter being the basis of the injunction sent). Although the factual change was one basis for the holding in *Gross*, id, that holding was also based upon a change in law which distinguishes it from the case before us. Further, the Trial Court's opinion at footnote 8 quotes *Gross*, id, as stating, "A different situation is presented in cases involving a prayer for damages or where Appellant is suffering a *continuing harm*." (emphasis ours)

The question of a type of continuing harm has been addressed by various courts, Appellant cites *Humphrey v. Cady*, 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972). "Civil commitment entails a massive curtailment of liberty." and *Addington v. Texas*, 441 U.S. 418, 426, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323, 331 (1979): "Whether we label this phenomena 'stigma' . . . it can have a very significant impact on the individual." The Trial Court interprets the term 'continuing harm' in *Gross*, supra, as encompassing some type of physically measurable harm. We choose to interpret the term as also encompassing a more elusive type of harm which other courts have referred to as 'stigma'. The courts have recognized that this stigma of being branded a mentally ill patient is as great as and may be more significant than being branded a criminal. *Commonwealth ex rel. Finken v. Roop*, 234 Pa.Super. 155, 339 A.2d 764, 771 (1976).

Further, *Commonwealth ex rel. Bielat v. Bielat*, 257 Pa. Super. 446, 390 A.2d 1321 (1978) held specifically that even though the committee (patient) was already discharged from the state hospital, the appeal from the order of involuntary commitment was not moot. (Citing *Commonwealth v. Walker*, 447 Pa. 146, 288 A.2d 741 (1972) where an appeal was decided in a criminal case even though Appellant had died pending the appeal and *Wolfe v. Beal*, 477 Pa. 472, 384 A.2d 1187 (1978) where the records of a person unlawfully committed to a state mental hospital may be expunged and thus the issue was not moot).

As illustrated by the authority cited above, it is sometimes necessary to address an issue which, although moot as to actual facts or as to concrete aspects of the question, requires an evaluation of a more etheral nature. That is the case here. The question presented in this case is not moot for the reason set forth above, i.e. the Appellant is suffering a continuing harm to her reputation and is enduring the stigma of identification as an involuntarily committed mental patient—If this identification is incorrect, then she must be vindicated by a repeal of the Trial Court's Order.

The merits of this case now must be considered. The incidents leading up to Appellant's commitment are not in dispute. On April 8, 1979, Appellant was taken to the Nutrition Center, a county sponsored Senior Citizen service, on a bus driven by one Jean Murphy. Later in the day Appellant apparently became involved in an altercation with some of the other people at the center, and decided to walk home. It had been raining hard and Appellant, a 66 year old woman, would have had to have walked 6 miles through a highly congested area, including crossing two major four-lane highways, in order to get home. Mrs. Murphy and local police eventually found her on a driveway about 50 yards from the center, and tried to get her onto the bus. When touched by Mrs. Murphy, Appellant struck her once with an umbrella. Finally, she did board the bus and dozed the rest of the way home. (N.T., pp. 11–15).

At the hearing before the Mental Health Review Officer, Dr. Houey (Yoo), a staff psychologist at Eugenia Hospital, also testified that, in his medical opinion, Appellant suffered from a mental disease which caused her to be excessively suspicious of people and which tended to make her extremely excitable. He felt that it was quite possible, due to her low tolerance for frustration, that she might strike someone else again, but stated that the greatest danger at the time was to herself. Finally, he testified that she required inpatient therapy as opposed to outpatient, as she needed constant supervision to prevent her from wandering away as she had from the Nutrition Center. (N.T., pp. 28–34).

Appellant contends that she was prejudiced by the Trial Court having continued her commitment upon another basis than that found by the Mental Health Review Officer. Appellant had originally been determined by the reviewing officer to have been a danger to others, whereas the Trial Court felt that the more serious problem was that she presented a danger to herself. We, like the Trial Court, fail to see that Appellant's counsel's alleged lack of notice of the latter basis for commitment could possibly have changed his preparation for the hearing. The factual basis for the finding was based on precisely the same series of events related to the review officer.

Appellant contends that although the Trial Court's interpretation of 50 P.S. 7303(g) (Supp. 1979–1980) is correct in allowing a de-novo review of the commitment petition that Court's use of this review violated the due process clause of the Constitution.

The due process clause of the Constitution does indeed require certain elements, among which are notice sufficient to rebut the allegations and to prepare initial defenses. We, however, in accordance with the Trial Court, cannot visualize the situation where there are such differing requirements between defending allegation of harm to others and the allegation of harm to oneself. The facts are undisputed and the Appellant's actions are the determining factors in the Trial Court's decision. Whether they are interpreted as

evidencing a clear and present danger to oneself or others, the Trial Court was justified in continuing the limited commitment of appellant on the factual conclusion of possible harm itself.

"Pennsylvania courts have not fully delineated the nature of the process that is due with respect to civil commitment. There is no question that the substantial deprivation of individual liberty inherent in such commitments may only be accomplished in accordance with due-process standards." *Commonwealth v. McQuaid*, 464 Pa. 499, 347 A.2d 465 (1975).

"A finding of 'mental illness' alone cannot justify a state's locking up a person against his will ... there is still no constitutional basis for confining such person involuntarily if they are dangerous to no one and can live safely in freedom." *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396 (1975). Thus, by interpretation of *O'Connor*, id, it can be said that there is a constitutional basis for confinement if they are dangerous and can't live safely in freedom—either to self or others.

In addition, when reading Section 303(g) of the Mental Health Procedures Act, which provides in pertinent part:

"In all cases in which the hearing was conducted by a mental health review officer, a person made subject to treatment pursuant to this section shall have the right to petition the court of common pleas for review of the certification. A hearing shall be held within 72 hours after the petition is filed unless a continuance is requested by the person's counsel. The hearing shall include a review of the certification and such evidence as the court may receive or require. If the court determines that further involuntary treatment is necessary and that the procedures prescribed by this act have been followed, it shall deny the petition. Otherwise, the person shall be discharged."

Along with *O'Connor*, supra, and *McQuaid*, supra, it is clear that the statutory language provides for a *de novo* review of the certification and allows the court to hear new evidence above and beyond that considered by the Mental Health

Review Officer. In view of the fact that any new evidence received and utilized by the Trial Court in its decision was substantially the same as that originally alleged (i.e. the harm is the same, the victim is different) and that since the actual due process requirements in a civil commitment have not been strictly delineated (*McQuaid,* supra) we find that the Trial Court not only did not violate Appellant's due process rights as to notice but used its discretion in receiving and reviewing the evidence with Appellant's best interest of paramount concern.

Finally, Appellant contends that the evidence was insufficient to establish that she was a clear and present danger to herself or others. After a review of the facts, we find that the record amply demonstrates that she was in need of further testing and treatment. The incident at the Nutrition Center, taken together with her violent outburst against Mrs. Murphy, and perhaps the most telling of all, Dr. Houey's testimony, leads us to affirm the Trial Court's conclusion that Appellant could not adequately care for herself and would, in all probability, seriously endanger herself in the near future. As in *Commonwealth ex rel. Gibson v. DiGiancinto,* 261 Pa.Super. 53, 395 A.2d 938 (1978) (although a criminal factual situation, we feel the involuntary commitment there analogous to the situation before us), we find that Appellant's "capacity to exercise self-control, judgment and discretion in the conduct of his (her) affairs and social relations, or to care of his (her) own personal needs was so lessened that he (she) posed a clear and present danger of harm to others and self and his (her) involuntary commitment to a mental hospital was the 'least restrictive alternative' available."

There are two operative legal mechanisms, i.e. "clear and present danger" and "least restrictive alternative". *Commonwealth ex rel. Platt v. Platt,* 266 Pa.Super. 276, 404 A.2d 410 (1979) defines the former. That case held that a "clear and present" danger is presented if a person has, within the last 30 days, inflicted or attempted to inflict serious bodily harm on another and there is a reasonable probability that

such conditions will be repeated. Thus, as can be deduced from the facts of the case before us, Appellant did present a "clear and present danger".

As to the "least restrictive alternative", Appellant required testing in order to determine the extent and seriousness of her mental illness. Dr. Houey testified that she required constant supervision in order to prevent her from simply wandering in the streets. We agree with the Trial Court that Dr. Houey's estimation of a ten days minimum time for testing is not excessive. Although he had recommended 20 days, the Mental Health Review Officer found the less restrictive 10 days commitment to be more appropriate, and Dr. Houey modified his recommendation to conform to that determination. Thus, the Mental Health Review Officer's Order did not represent the least restrictive alternative.

The Trial Court found, from "personal observation", that Appellant was truly in need of the services offered by the mental health system (Opinion at Page 170). We find no substance in fact or in law to overturn this conclusion.

Accordingly, I would affirm.