668 A.2d 565

Anne L. ALLEN, a/k/a Nancy Allen, an incompetent, by Walter E. Allen and Anne M. Allen, her guardians and Walter E. Allen and Anne M. Allen, in their own right, Appellants,

v.

MONTGOMERY HOSPITAL and Paul R. Casey, Jr., M.D.

Superior Court of Pennsylvania.

Argued May 18, 1995.

Filed Dec. 19, 1995.

John V. Hasson, Fort Washington, for appellants.

Rostaine Tharaud, Norristown, for Montgomery Hospital, appellee.

William H. Pugh, IV, Norristown, for Paul R. Casey, Jr., M.D., appellee.

Before McEWEN, JOHNSON and BROSKY, JJ.

JOHNSON, Judge.

In this appeal, we are asked to determine whether the immunity provision of the Mental Health Procedures Act applies to a health care provider who is not trained in the field of mental health, and who treats a patient's physical ailments, not a mental illness. Because we find that the immunity provision does not apply to such a situation, we reverse and remand this matter for a new trial.

Nancy Allen, an incompetent, by her parents, Walter E. and Anne M. Allen, and the Allens in their own right appeal from the order that denied their motion for a new trial and entered judgment in favor of Montgomery Hospital and Paul R. Casey, Jr., M.D. Nancy, who has been diagnosed as mentally retarded with psychosis, was admitted to Norristown State Hospital in August 1980, after she had an adverse reaction to her medication and her parents had difficulty controlling her behavior. Nancy remained in Norristown State Hospital until November 1982, when she suffered physical ailments, including fever, dehydration, and a possible urinary tract infection. As a result, on November 30, 1982, Nancy was transferred to Montgomery Hospital for treatment of those physical ailments pursuant to an agreement between the hospitals. Upon her arrival at Montgomery Hospital, Nancy was examined in the emergency room by Dr. Casey, an internist. Dr. Casey found that Nancy was dehydrated and had a fever of unknown origin. In addition, Nancy showed signs of agitation. Dr. Casey directed that Nancy be admitted to Montgomery Hospital and ordered tests to rule out drug toxicity or a urinary tract infection. Nancy was then assigned to a private room on the orthopedic floor of the hospital.

Nancy received intravenous fluids, and was given medication to quiet her agitation as needed. As a result of her agitation and because she had trouble walking, a nurse placed Nancy in a Posey vest restraint. A Posey restraint covers the patient's chest, but allows his or her arms to remain free. Straps on the back of the restraint are tied to the bed to keep the patient from getting out of bed. Although Dr. Casey did not order the restraint, he knew about its use and did not

order its removal. Except when she was given back care, or when her bedding or clothing was being changed, Nancy remained in the restraint at all times. Nancy's condition steadily improved, and she was scheduled for discharge on December 6, 1982.

However, on December 5, 1982, at approximately 2:00 a.m., a nurse found Nancy suspended about 6 inches above the floor between the siderails and her bed. She had managed to remove one arm from the Posey restraint, which had become entangled around her neck and was choking her. By the time she was discovered, Nancy had lost consciousness. The nurse, assisted by other nursing staff, was able to free Nancy from the restraint and begin CPR. Nancy was resuscitated, but she suffered hypoxic encephalopathy resulting in permanent brain damage.

Thereafter, Nancy's parents were appointed as her guardians. They filed a malpractice claim against Montgomery Hospital and Dr. Casey, seeking to recover for Nancy's injuries as well as their own derivative claims. Norristown State Hospital and several other companies that supplied the Posey restraint were joined as additional defendants; however, the suppliers of the restraint were granted summary judgment.

Prior to trial, Montgomery Hospital and Dr. Casey filed a joint motion in limine, in which they requested a ruling as to whether the provisions of the Mental Health Procedures Act (MHPA), 50 P.S. § 7101, *et seq.*, were controlling in this case. Specifically, they requested that they be afforded limited immunity pursuant to 50 P.S. § 7114. The effect of such immunity would be to immunize them from liability absent willful misconduct or gross negligence. Following a hearing, the trial court granted the motion and, pursuant to Pa.R.A.P. 1311, certified its interlocutory order for appeal to this Court. However, by order dated October 17, 1991, this Court declined to hear the appeal. The Allens then filed a petition for allowance of appeal to our supreme court, which was denied.

Subsequently, the case was bifurcated, and a jury trial commenced on the liability phase. After the Allens rested, a

nonsuit was granted in favor of Norristown State Hospital. At the close of all of the evidence, the trial court instructed the jury regarding the standard it was to apply to determine liability. Because there were no allegations of willful misconduct, the court instructed the jury that it could not find Dr. Casey or Montgomery Hospital liable for Nancy's injuries unless it determined that their conduct constituted gross negligence. The jury returned a verdict finding that neither Montgomery Hospital nor Dr. Casey had been grossly negligent in treating Nancy. Thereafter, the Allens filed post-trial motions requesting a new trial. By order dated August 18, 1994, the court denied their motions and directed that judgment be entered in favor of Dr. Casey and Montgomery Hospital. This appeal followed.

On appeal, the Allens raise the following contentions, which we have renumbered for purposes of review. The Allens assert that the trial court erred in determining that the immunity provisions of the MHPA applied to Dr. Casey and Montgomery Hospital because (1) they were treating Nancy's physical ailments, not a mental illness; (2) they failed to comply with the treatment provisions of the MHPA; and (3) the MHPA applies only to treatment decisions, not to the manner in which the care was administered. Finally, the Allens argue that (4) if Dr. Casey and Montgomery Hospital are entitled to immunity under the MHPA, then the immunity provision of the MHPA is unconstitutional. For all of these reasons, the Allens contend that the trial court erred in refusing to grant them a new trial.

 Initially, we note that "[i]n reviewing the denial of a motion for a new trial, this [C]ourt must determine whether the trial court committed an abuse of discretion or error of law which controlled the outcome of the case." *Trude v. Martin*, 442 Pa.Super. 614, 629, 660 A.2d 626, 633 (1995). Further, "[w]henever a court attempts to ascertain the meaning of certain language within a statute, its goal is to effectuate the intent of the Legislature." *Frontini v. Com. Dept. of Transp.*, 527 Pa. 448, 451, 593 A.2d 410, 411–12 (1991); *see also* 1 Pa.C.S. § 1921.

First, the Allens contend that because Dr. Casey and Montgomery Hospital were treating Nancy's physical ailments, the trial court erred when it determined that the immunity provisions of the MHPA were applicable to the facts of this case. The General Assembly enacted the MHPA in 1976 to provide rights and procedures for the treatment of the mentally ill in this Commonwealth. 50 P.S. § 7103. In pertinent part, the policy underlying this act is set forth in 50 P.S. § 7102 as follows:

> It is the policy of the Commonwealth of Pennsylvania to seek to assure the availability of adequate treatment to persons who are mentally ill, and it is the purpose of this act to establish procedures whereby this policy can be effected. The provisions of this act shall be interpreted in conformity with the principles of due process to make voluntary and involuntary treatment available where the need is great and its absence could result in serious harm to the mentally ill person or to others. Treatment on a voluntary basis shall be preferred to involuntary treatment; and in every case, the least restrictions consistent with adequate treatment shall be employed. Persons who are mentally retarded, senile, alcoholic, or drug dependent shall receive mental health treatment only if they are also diagnosed as mentally ill, but these conditions of themselves shall not be deemed to constitute mental illness[.]

Consistent with this policy, the MHPA affords certain health care providers limited immunity from civil and criminal liability for specific decisions regarding treatment of a mentally ill patient. "This immunity is available to a *mental health provider* absent willful misconduct or gross negligence." *Farago v. Sacred Heart Gen. Hosp.*, 522 Pa. 410, 414, 562 A.2d 300, 302 (1989) (emphasis added). The relevant language of the immunity provision provides:

> (a) In the absence of willful misconduct or gross negligence, a county administrator, a director of a facility, a physician, a peace officer or any other authorized person who participates in a decision that a person be *examined or treated under this act,* or that a person be discharged, or placed

under partial hospitalization, outpatient care or leave of absence, or that the restraint upon such person be otherwise reduced, or a county administrator or other authorized person who denies an application for voluntary treatment or for involuntary emergency examination and treatment, shall not be civilly or criminally liable for such decision or for any of its consequences. [Emphasis added].

50 P.S. § 7114(a). Further, our supreme court has held that the language "any other authorized person" encompasses hospitals. *Farago, supra,* 522 Pa. at 419, 562 A.2d at 303.

The Allens assert that this provision does not apply in Nancy's case because she was not being treated under the MHPA while at Montgomery Hospital. As stated previously, the Allens contend that the act is inapplicable because Nancy was not being treated for mental illness; rather, she was being treated for her physical ailments. Section 7104, Provision for treatment, provides:

Adequate treatment means a course of treatment designed and administered to alleviate a person's pain and distress and *to maximize the probability of his recovery from mental illness. It shall be provided to all persons in treatment who are subject to this act.* It may include inpatient treatment, partial hospitalization, or outpatient treatment. Adequate inpatient treatment shall include such accommodations, diet, heat, light, sanitary facilities, clothing, recreation, education and medical care as are necessary to maintain decent, safe and healthful living conditions.

Treatment shall include diagnosis, evaluation, therapy, or rehabilitation needed to alleviate pain and distress and to facilitate the recovery of a person from mental illness and shall also include care and other services that supplement treatment and aid or promote such recovery.

50 P.S. § 7104 (emphasis added). Further, the MHPA requires that a treatment team formulate and review an individualized treatment plan for every person who is treated under the act. 50 P.S. § 7106. An individualized treatment plan is "a plan of treatment formulated for a particular person in a program appropriate to his specific needs." 50 P.S. § 7107.

To the extent possible, such plans must be made "with the cooperation, understanding and consent of the person in treatment, and shall impose the least restrictive alternative consistent with affording the person adequate treatment for his condition." *Id.*

Our research has failed to disclose any case in which the MHPA was held to grant limited immunity to a health care provider other than a psychiatrist. Nor has the immunity provision been held to apply to *any* health care provider, including a psychiatrist, who was treating a mentally ill patient for a *physical* illness. Rather, the cases in which the limited immunity provision has been applied involve psychiatrists who made decisions regarding the level of supervision or restraint necessary to treat their patients' mental illnesses.

For example, in *Farago, supra,* Jessie Farago, who had a history of mental illness, was voluntarily admitted to the psychiatric unit of a hospital for treatment of her chronic schizophrenic condition. Following an evaluation by the admitting nurse and a telephone consultation with the psychiatrist, it was determined that Farago did not require any special observation. As a result, she was placed on an open co-ed ward. Farago maintained that she was raped by another patient in the bathroom adjoining the ward. Subsequently, Farago and her husband filed suit against the hospital, alleging that the hospital was negligent in its supervision and protection of Farago while she was in the psychiatric unit. The trial court determined that the MHPA immunity provision was applicable, and the jury returned a verdict in favor of the hospital. On appeal to our supreme court, the Faragos contended that the immunity provision was inapplicable to the facts of their case and the jury should have been instructed to apply an ordinary negligence standard. Specifically, the Faragos asserted that the immunity provision was applicable only to certain acts enumerated in the section, namely decisions to admit or discharge patients or reduce patients' restraints. The court disagreed, stating that "[o]ne of the purposes of the [MHPA] is to provide limited protection from civil and criminal liability to mental health personnel and their employers in

rendering treatment in this unscientific and inexact field." *Id.* at 417, 562 A.2d at 304. Thus, the court concluded that the decision by the hospital staff to allow Farago to remain in the open ward rather than on closer supervision was a treatment decision consistent with the MHPA mandate to impose the least restrictive alternatives consistent with providing the patient with adequate treatment. *Id.* at 418, 562 A.2d at 304.

Similarly, in *Werner v. Dept. of Public Welfare*, 109 Pa. Cmwlth. 134, 530 A.2d 1004 (1987), Charles Werner, a psychiatric patient at a state hospital, committed self-mutilation by removing his eye with a blunt stick several hours after he was released from prescribed leather restraints. Werner and his mother filed suit, alleging that the hospital was negligent in its treatment and supervision of Werner. The trial court instructed the jury that, with respect to the decision to release the restraints, the hospital could be found liable only if it is was grossly negligent. However, as to *all other* allegations of inadequate treatment, the trial judge instructed the jury to apply a *simple negligence* standard. The Commonwealth Court affirmed, reasoning that the decision to reduce a patient's restraints is expressly enumerated in the MHPA immunity provision. *Id.*

In contrast, this Court has held that the immunity provision did not apply to the conduct of an ambulance attendant while transporting a mentally ill patient to the hospital. *McNamara v. Schleifer Ambulance Serv.*, 383 Pa.Super. 100, 556 A.2d 448 (1989). In that case, the patient was seated in a rear seat of the ambulance with his seat belt fastened. However, the attendant unfastened the patient's seatbelt to re-position himself near a second patient who was experiencing some distress. After his seatbelt was unfastened, the mentally ill patient opened the rear doors of the ambulance and jumped out. The trial court granted summary judgment in favor of the ambulance service on the basis of the immunity provision of the MHPA. On appeal, this Court reversed, finding that the ambulance service was not entitled to immunity under the MHPA. In doing so, we reasoned that the decision to release the patient from his seatbelt was not a decision that took place

within the context of treatment, care, diagnosis, or rehabilitation as contemplated by the legislature. *Id.* at 103, 556 A.2d at 449. Further, we stated that under the MHPA, the individuals who would make decisions that qualify for immunity under the act would be trained in the field of mental health. *Id.*

■ Based upon the reasoning set forth in these cases, it is clear that the appellate courts of this Commonwealth have interpreted the immunity provision of the MHPA to apply only where a physician trained in the mental health field treats a patient's mental illness. Accordingly, both *Farago* and *Werner* are distinguishable from the present case. In those cases, psychiatrists made treatment decisions concerning the removal of restraints or supervision of a mentally ill patient. Further, the patients were admitted to the psychiatric wards of the hospitals in order to treat those mental illnesses.

■ Here, however, Nancy was treated by Dr. Casey, an internist, for fever and dehydration, internal medical problems. N.T., October 8, 12, Volume II, at 505–506. She was placed in a restraint due to her intermittent agitation and difficulty walking. *Id.* at 621. Absolutely no evidence was presented that her agitation resulted from, or was in any way related to, her mental retardation or psychosis. Dr. Casey testified that Posey restraints were commonly used on patients who were not mentally ill. *Id.* at 620. Thus, there is no indication that the Posey device was used to treat anything other than a physical condition.

Further, during her stay at Montgomery Hospital, Nancy was never seen by a psychiatrist, nor did Dr. Casey consult with Nancy's psychiatrist from Norristown State Hospital. *Id.* at 569. Nancy was admitted to the orthopedic floor of the hospital where other medical and surgical patients were assigned, not to the psychiatric floor. *Id.* at 408. Dr. Casey also testified that in his experience, patients were never transferred to Montgomery Hospital from Norristown State Hospital for treatment of their mental illnesses. *Id.* at 655–

56. As a result, we find that the immunity provision of the MHPA is inapplicable to the facts of this case. Therefore, we are constrained to conclude that the trial court erred in determining that the MHPA's immunity provision was applicable to this case. Accordingly, the trial court erred when it instructed the jury that it could not find Dr. Casey or Montgomery Hospital liable absent gross negligence. Because this error may have controlled the outcome of this case, we must reverse the trial court order that denied the Allens' motion for a new trial and directed that judgment be entered in favor of Dr. Casey and Montgomery Hospital. Accordingly, we reverse and remand this matter for a new trial.

Because of our resolution of the Allens' first issue, we do not address their remaining contentions.

Order Reversed. Case Remanded. Jurisdiction Relinquished.

BROSKY, J., files a dissenting opinion.

BROSKY, Judge, dissenting.

I believe that the trial court correctly interpreted and applied the immunity provision of the Mental Health Procedures Act ("MHPA"), 50 P.S. § 7114(a). Since the majority has held otherwise, I am unable to join in its disposition and respectfully dissent therefrom. However, I write separately to articulate my rationale for affirming the order.

All of appellants' allegations of error implicate the trial court's construction and application of the MHPA. I will therefore begin with a review of the pertinent statutory provisions as well as the fundamental rules of statutory construction before deciding whether the trial court abused its discretion or committed an error of law. Appellees, as providers of health care to a mentally ill individual, have invoked the limited immunity granted under section 7114(a) of the MHPA, 50 P.S., which is set forth as follows:

> In the absence of willful misconduct or gross negligence, a county administrator, a director of a facility, a physician, a peace officer or any other authorized person who partici-

pates in a decision that a person be examined or treated under this act, or that a person be discharged, or placed under partial hospitalization, outpatient care or leave of absence, or that the restraint upon such person be otherwise reduced, or a county administrator or other authorized person who denies an application for voluntary treatment or for involuntary emergency examination and treatment, shall not be civilly or criminally liable for such decision or for any of its consequences.

50 P.S. § 7114(a).[1]

In construing this statute, the primary objective is to ascertain and effectuate the intention of the General Assembly. 1 Pa.C.S.A. § 1921(a). If possible, the statute must be construed to give effect to all of its provisions. *Id.* Where the words of a statute are clear and free from all ambiguity, the courts are not free to disregard the letter of it under the pretext of pursuing its spirit. *Id.,* § 1921(b).

When the words of the statute are not explicit, however, the intention of the General Assembly may be ascertained by considering, among other matters:

(1) The occasion and necessity for the statute; (2) The circumstances under which it was enacted; (3) The mischief to be remedied; (4) The object to be attained; (5) The former law, if any, including other statutes upon the same or similar subjects; (6) The consequences of a particular interpretation; (7) The contemporaneous legislative history; and (8) Legislative and administrative interpretations of such statute.

*Id.,* § 1921(c). In ascertaining the legislature's intent, the courts are to presume that the General Assembly: (1) did not

---

1. Appellants did not assert that appellees had engaged in any willful misconduct; rather, they alleged that appellees had been negligent. The willful misconduct element thus will not be further addressed. Except for the clause granting immunity to a physician or any other authorized person who participates in a decision that a person be treated or examined, the situation presented here does not appear to fall within any of the other enumerated categories for which immunity may be granted. I will accordingly confine my analysis to this part of the statute.

intend a result that is absurd, impossible of execution or unreasonable; (2) intends the entire statute to be effective and certain; (3) did not intend to violate the Constitution of the United States or of this Commonwealth; and (4) intends to favor the public interest as against any private interest. 1 Pa.C.S.A. § 1922(1)–(5). The courts are also required to construe statutes or parts of statutes which are in *pari materia* together, if possible. 1 Pa.C.S.A. § 1932(b).

In general, the provisions of a statute must be liberally interpreted to effect its object and to promote justice. *See* 1 Pa.C.S.A. § 1928(c) (providing that statutes which do not fall within the classes enumerated in subsection (b), none of which are applicable here, shall be liberally construed). However, this court has recognized that particular provisions of the MHPA must be strictly construed. For example, in the case of *In re: S.C.*, 280 Pa.Super. 539, 421 A.2d 853 (1980), we examined the standards by which a person may be involuntarily committed for an extended period of time pursuant to 50 P.S. § 7303(b). The Superior Court reasoned that this provision should be strictly construed because an involuntary civil commitment implicates an individual's fundamental liberty interest, which he or she should not be deprived of without due process of law. *Id.*, 280 Pa.Super. at 547, 421 A.2d at 857. Similar reasoning was utilized in *Commonwealth v. Blaker*, 293 Pa.Super. 391, 394, 446 A.2d 976, 978 (1981), where we relied on *S.C.* in support of our decision to strictly construe section 7301 of the MHPA, which governs involuntary emergency examination and treatment. Our subsequent decisions later extended the strict construction approach to other provisions of the MHPA even though the statute in question did not fall within the categories enumerated in section 1928(b) of the Statutory Construction Act, 1 Pa.C.S.A., and no fundamental liberty interest was at issue therein. *See, e.g., Commonwealth v. Fewell*, 439 Pa.Super. 541, 561–562, 654 A.2d 1109, 1119 (1995); *In the Interest of Roy*, 423 Pa.Super. 183, 186, 620 A.2d 1172, 1173 (1993), *allocatur denied*, 536 Pa. 644, 639 A.2d 30 (1994) and *Commonwealth v. Moyer*, 407 Pa.Super. 336, 339–340, 595 A.2d 1177, 1179 (1991), *allocatur denied*, 529 Pa.

656, 604 A.2d 248 (1992) (all of which strictly construed section 7111, which relates to the confidentiality of a patient's treatment records).

The instant case does not involve a deprivation of liberty as in *In re: S.C.* and *Blaker.* Nor does it involve the protection of a privacy right of the type at issue in *Fewell, Roy* and *Moyer.* Section 7114(a) of the MHPA also does not fall within the categories which must be strictly construed under 1 Pa.C.S.A. § 1928(b). I further note that while the issue was not directly addressed therein, our Supreme Court has employed a liberal rather than strict construction of section 7114. *See Farago v. Sacred Heart General Hospital,* 522 Pa. 410, 416–419, 562 A.2d 300, 303–304 (1989) (in construing statutory reference to any other authorized "person," the Supreme Court utilized the definitions found in the Statutory Construction Act and concluded that the term encompassed organizational entities, including corporations, partnerships and associations as well as natural persons; the Court also rejected the plaintiffs' narrow interpretation of the type of conduct for which immunity could be granted). Under these circumstances, *In re: S.C.* and its progeny should not control the scope of construction of section 7114. Instead, I will follow the approach taken by the Supreme Court in *Farago* and employ a liberal construction. With these principles firmly in mind, I will now turn to the merits of appellants' claims.

Appellants first contend that the immunity provided in section 7114 should be construed to only apply to the persons specified therein who provide mental health care to patients. Appellants thus assert that appellees are not entitled to avail themselves of the immunity defense since they provided medical care to Nancy and treated her physical rather than mental disease. Appellants' argument that appellees were not treating Nancy's mental health is somewhat disingenuous.

Mental health and physical health cannot be viewed as wholly distinct entities and cannot be divorced from each other. Mental illness may be a manifestation of a physiological problem resulting from chemical imbalances within the body, trauma or the result of another disease process. This is

especially true in Nancy's case, as her mental illness stems from her previous illnesses and idiosyncratic reactions to her medication. It was also the administration of medication and her failure to respond appropriately thereto which contributed to the deterioration of her physical health. More importantly, Nancy's medical records indicate that Norristown administered various drugs to her in an attempt to calm her highly agitated state. Appellees provided Nancy with similar drug therapy in addition to treating her other health-related ailments. It is thus inaccurate to suggest that appellees only treated Nancy's physical rather than mental condition. Because of the inter-relation between mental and physical health, emphasis should not be placed on the type of treatment rendered by a particular organization or physician. Rather, the focus should be on whether the treatment administered to a mentally ill person falls within the scope of conduct for which immunity is granted.

As indicated above, the MHPA grants limited immunity from civil and criminal liability for a treatment decision or any of its consequences to "a physician . . . or any other authorized person who participates in a decision that a person be . . . treated under this act." [2] 50 P.S. § 7114(a), *supra.* While this provision does not specifically define the term "treated," definitions of adequate treatment and treatment are found elsewhere in the MHPA and appear as follows:

> Adequate treatment means a course of treatment designed and administered to alleviate a person's pain and distress and to maximize the probability of his recovery from mental illness. It shall be provided to all persons in treatment who are subject to this act. It may include inpatient treatment, partial hospitalization or outpatient treatment. Adequate treatment shall include such accommodations, diet, health, light, sanitary facilities, clothing, recreation, education and *medical care* as are necessary to maintain decent, safe and healthful living conditions. Treatment shall include diagno-

---

**2.** Our Supreme Court has construed the term "any other authorized person" to include an organizational entity such as a hospital. *Farago v. Sacred Heart General Hospital*, 522 Pa. at 417–419, 562 A.2d at 303–304. Consequently, Montgomery falls within the ambit of the statute.

sis, evaluation, therapy or rehabilitation needed to alleviate pain and distress and to facilitate the recovery of a person from mental illness and shall also include *care and other services that supplement treatment and aid or promote recovery.*

50 P.S. § 7104 (emphasis added). In construing the statute, I am also cognizant of the legislature's intent, which has been articulated as follows:

It is the policy of the Commonwealth of Pennsylvania to seek to assure the availability of adequate treatment to persons who are mentally ill, and it is the purpose of this act to establish procedures whereby this policy can be effected. The provisions of this act shall be interpreted in conformity with the principles of due process to make voluntary and involuntary treatment available where the need is great and its absence could result in serious harm to the mentally ill or to others. Treatment on a voluntary basis shall be preferred to involuntary treatment; and in every case, the least restrictions consistent with adequate treatment shall be employed.

50 P.S. § 7102.

Review of the above provisions makes it clear that the legislature intended to make the least restrictive and adequate treatment available to those who are mentally ill. 50 P.S. § 7102, *supra*. *See also* 50 P.S. § 7107 (requiring a treatment plan formulated for a particular patient to be the least restrictive alternative consistent with affording the person adequate treatment for his or her condition). In defining the extent of the treatment covered by the act, the legislature could have specifically limited it to the care and services directly relating to a patient's mental illness. The legislature did not do so and instead broadly defined treatment to include *medical care* as well as any other care and services which will alleviate a patient's pain and distress and promote his or her recovery from mental illness. 50 P.S. § 7104, *supra*.

Appellants nonetheless suggest that the same standard of negligence should be applied regardless of the mental status

of their patient, since the health care provider renders the same services to both types of patients. While appellants' reasoning is facially appealing, it contravenes the legislature's clear intent and ignores the fact that mentally ill patients may require more specialized or intensive care for their medical needs precisely because of their mental illness. If appellants' interpretation is adopted, some medical care providers would be unwilling to render care and services to mentally ill patients because of the increased risk of injury and costs associated therewith, including the potential for litigation.[3] Even if treatment were to be offered, health care practitioners would attempt to minimize their risks by placing the mentally ill patients in a more restrictive environment or adopting other precautions which would lead to the imposition of greater cost on the patient thereby making such care less affordable and available. Such a result would violate the legislature's expressed purpose of making adequate treatment, including medical care, available to the mentally ill.

It is obvious that Nancy was a mentally ill patient who received treatment from Norristown in accordance with the provisions of the MHPA. In treating Nancy's mental condition, Norristown was required to maintain decent, safe and healthful living conditions for Nancy, including the provision of medical care. 50 P.S. § 7114, *supra.* Because Norristown was not equipped to handle all of its patients' medical needs, it entered into an agreement with Montgomery Hospital and Dr. Casey, pursuant to which they would provide the requisite medical care to Norristown's patients. Appellees thus assumed Norristown's duties and responsibilities while the patients were transferred into their custody and care. Had Norristown been equipped to treat Nancy's physical maladies, it would unquestionably have been entitled to avail itself of the limited immunity provided by the MHPA. Moreover, appellees were providing treatment for Nancy's mental condition to

**3.** This attitude may be even more prevalent today in light of the tremendous changes occurring in the health care arena. Health care providers are shifting towards a managed care approach, the effect of which has been to force institutions to emphasize cost control and expenditure reduction.

the extent that attempts were made to calm her agitation. Under these circumstances, I am not persuaded that immunity should be denied merely because a different health care provider assumed Norristown's duties for a limited period of time.

In light of the legislature's explicit intent, the rules of statutory construction and the above reasoning, I interpret section 7114's usage of the term "treated" to have the same meaning as set forth by the legislature in section 7104 of the MHPA. Construction of the statute in this manner ensures that the least restrictive treatment will be made available to the mentally ill in exchange for which those who render such care will receive immunity from civil and criminal liability, absent willful misconduct or gross negligence. Because the trial court properly construed the MHPA as conferring immunity on appellees for their provision of care to Nancy, appellants are not entitled to relief on this basis.

Appellants next argue that the limited grant of immunity does not apply to the *manner* in which the health care was administered. Appellants instead believe that the immunity only covers a health care practitioner's decision to administer a specific plan of treatment to a patient. Under appellants' approach, immunity would only exist for the decision to render treatment to a patient; it would not apply to the actual implementation of the treatment plan itself. Such a result would be unreasonable, would thwart the legislature's intent, and would render the limited grant of immunity wholly nugatory.

The legislature specifically granted immunity for a treatment decision or for any of its consequences. *See* 50 P.S. § 7114(a), *supra.* This language evinces the legislature's recognition that a plan of treatment would be actually administered to the mentally ill patient and not merely formulated for theoretical purposes. If the immunity statute is be construed in the manner posited by appellant, it would have been unnecessary for the legislature to grant health care providers immunity because, without actual implementation, the mere creation of the plan would have absolutely no effect and would

not give rise to any litigation. Rather, it is the actual administration of the treatment plan which could have possible untoward consequences for the patient and others with whom he or she has contact.

When viewed within this context, it is obvious that the immunity provision serves to protect health care providers for their actual administration of the treatment plan in the event it does not work as anticipated. Appellants' interpretation, however, would render the immunity virtually meaningless since it would only apply to the formulation of the treatment plan which, standing alone, has no effect on the patient. Appellants' approach would further permit suit to be brought for the administration of treatment, and thus, would result in either less available or more restrictive care to the patient, as previously discussed. I therefore reject appellants' proposed interpretation and would hold that the statutory immunity granted to a health care provider's decision to treat a mentally ill patient necessarily includes the manner or actual administration of the treatment.

My conclusion is supported by the Supreme Court's decision in *Farago v. Sacred Heart General Hospital, supra.* In *Farago,* the plaintiff was admitted to the psychiatric unit of the hospital. *Id.,* 522 Pa. at 412, 562 A.2d at 301. Hospital staff decided that Mrs. Farago's schizophrenic condition did not require special observation and permitted her to stay on an open co-ed ward with hourly physical checks. *Id.* Several hours later, Mrs. Farago was discovered in a bathroom in the company of a male patient. *Id.,* 522 Pa. at 413, 562 A.2d at 301. Although she did not apprise hospital personnel of this information at the time, she told another staff member three days later that she had been raped by the male patient. *Id.* Mrs. Farago subsequently sued the hospital for their alleged negligence in failing to adequately supervise and protect her. *Id.,* 522 Pa. at 413, 562 A.2d at 302.

On appeal, the Supreme Court rejected the plaintiff's narrow and restrictive interpretation of section 7114 and determined that the hospital was entitled to invoke the limited immunity provided by the MHPA. *Id.,* 522 Pa. at 417–419,

562 A.2d at 303–304. In reaching this result, the Supreme Court cited the definitions of treatment and adequate treatment provided in section 7104 and found that the hospital's placement of Mrs. Farago on an open co-ed ward with hourly physical checks constituted a treatment decision which was protected under section 7114, absent gross negligence or willful misconduct. *Id.,* 522 Pa. at 417–418, 562 A.2d at 304. The Supreme Court's decision thus suggests that it did not accept the plaintiffs' attempt to avoid application of the statutory immunity by distinguishing between the defendant's formulation and execution of the treatment plan. *See id.*

Notwithstanding their assessment to the contrary, appellants are essentially challenging appellees' decision to utilize restraints and their failure to more thoroughly supervise Nancy. The decision to use a moderate restraint to prevent Nancy from injuring herself and others and the institution of regular checks is virtually indistinguishable from the type of treatment decision which was rendered in *Farago.* Consequently, appellees' treatment of Nancy falls within the scope of conduct for which immunity is granted. Since the trial court correctly interpreted and applied the statute, no relief is due on this claim.

Appellants' third issue involves the question of whether the trial court erred in applying the gross negligence standard to appellees' alleged violations of other provisions of the MHPA and the regulations promulgated thereunder. In their brief, appellants catalogue the statutory and regulatory violations allegedly committed by appellees. *See* Appellants' Brief at 42–44. These violations either implicate appellees' failure to prepare a proper treatment plan and consult with mental health professionals in accordance with 50 P.S. § 7106 and § 7107, or involve appellees' decision to use a restraint.

Appellants' arguments ignore the fundamental purpose for which the pertinent statutes and the regulations arising thereunder were created. Treatment plans must be implemented for individuals who are initiating mental health treatment; these plans must necessarily be revised on a continuing basis. However, there is no requirement that a plan be prepared for

a patient who is already receiving treatment and is merely transferred to another facility on a temporary basis.

In this case, Nancy became a patient at Norristown in 1980 and remained there until she was sent to appellees in 1982 for treatment of her specific physical problems. It was thus Norristown's responsibility to formulate the long-range psychiatric treatment plans for Nancy, including consultation with appropriate mental health professionals. Upon transferring Nancy, Norristown provided appellees with the information pertinent to her condition so that they could render appropriate care. In light of Nancy's particular physical symptoms, treatment for an extended period of time was not contemplated by appellees. Rather, appellees intended to return Nancy to Norristown's custody as soon as her physical symptoms improved.

Under these circumstances, there was simply no need for appellees to prepare the thorough type of treatment plan envisioned by the MHPA. Nor was it necessary for appellees to consult with other mental health professionals because it was Nancy's physical rather than mental illness which was in immediate need of treatment. Moreover, appellees were aware of Nancy's psychiatric condition and believed that they were able to adequately manage it with appropriate pharmacological therapy.

In any event, it is apparent that appellees did devise a treatment plan which included the administration of intravenous fluids, antibiotics, pain medication and sedatives, as well as the usage of a moderate physical restraint for Nancy's safety. This was the least restrictive plan of treatment which was specifically formulated for Nancy's individual needs, and therefore, constituted a treatment decision for which limited immunity is granted absent willful misconduct or gross negligence. *See Farago v. Sacred Heart General Hospital, supra.* The trial court thus did not err in refusing to apply an ordinary negligence standard with regard to appellees' alleged violations of the MHPA and the regulations promulgated thereunder.

Having disposed of the above questions and determined that none warrants the grant of any relief, appellants' challenge to the constitutionality of section 7114 must be addressed.[4] In considering this matter, it must be presumed that the General Assembly did not intend to violate either the United States or Pennsylvania Constitutions in enacting the statute. 1 Pa. C.S.A. § 1922(3). Moreover,

> [t]he strong presumption of constitutionality enjoyed by acts of the General Assembly and the heavy burden of persuasion on the party challenging an act have been so often stated as to now be axiomatic. Legislation will not be invalidated unless it clearly, palpably and plainly violates the Constitution, and any doubts are to be resolved in favor of a finding of constitutionality.

*Jenkins v. Hospital of the Medical College of Pennsylvania,* 535 Pa. 252, 262, 634 A.2d 1099, 1104 (1993) (citations and quotation marks omitted). Appellants' constitutional arguments will be examined in accordance with these principles.

4. A party challenging the constitutionality of a statute is required to notify the Attorney General, by registered mail, where the Commonwealth is not a party. Pa.R.C.P., Rule 235, 42 Pa.C.S.A.; Pa.R.A.P., Rule 521(a), 42 Pa.C.S.A. Where notice has not been given, the appellate courts will not consider the constitutional claim. *See, e.g., Kepple v. Fairman Drilling Co.,* 532 Pa. 304, 313, 615 A.2d 1298, 1303 (1992) (defendant waived constitutional argument by failing to notify the Attorney General pursuant to Pa.R.C.P. 235 and Pa.R.A.P. 521); *Hill v. Divecchio,* 425 Pa.Super. 355, 367, 625 A.2d 642, 648 (1993), *allocatur denied,* 538 Pa. 613, 645 A.2d 1316 (1994) (an appellate court will not consider a challenge to the constitutionality of a statute where no notice has been given to the Attorney General; if the litigant raising the constitutionality of the statute fails to notify the Attorney General pursuant to Pa.R.C.A. 235 and Pa.R.A.P. 521, the claim is barred). As applied here, I note that the Commonwealth was a party to this action, although the matters regarding its potential liability were removed from the case with the other litigants' consent. I also observe that the constitutional claim was not raised until appellants filed their post-trial motions. The certified record discloses that were served, albeit by regular mail, on Theodore Chylack, Esq., the Senior Deputy Attorney General representing the Commonwealth. It does not appear from the certified record that either Mr. Chylack or another member of the Attorney General's office elected to respond to this issue. Under these circumstances, appellants have sufficiently preserved their challenge to the constitutionality of the statute.

Appellants challenge the statute on equal protection grounds. It is appellants' position that the statute violates the equal protection clause of the Fourteenth Amendment to the United States Constitution because it permits the mentally ill to be treated differently from those who are not mentally afflicted by impinging upon their ability to institute suit against their health care providers.

> [P]rinciples of equal protection do not absolutely prohibit a state from classifying persons differently and treating the classes in different ways. Equal protection requires that uniform treatment be given [to] similarly situated parties. If distinctions are drawn, then the challenged policy must be reasonably justified. The level of justification required will depend upon the type of classification drawn and the governmental interest in promulgating the classification, and the relationship between that interest and the classification itself. . . . The types of classifications are: (1) classifications which implicate a "suspect" class or a fundamental right; (2) classifications implicating an important though not fundamental right; and (3) classifications which involve none of these. Should the statutory classification in question fall into the first category, the statute is strictly construed in light of a "compelling" governmental purpose; if the classification falls into the second category, a heightened standard of scrutiny is applied to an "important" governmental purpose; and if the statutory scheme falls into the third category, the statute is upheld if there is any rational basis for the classification.

*Dansby v. Thomas Jefferson Hospital,* 424 Pa.Super. 549, 557, 623 A.2d 816, 820 (1993), *allocatur denied,* 539 Pa. 650, 651 A.2d 538 (1994) (citations omitted).

Matters such as race, alienage, national origin, gender and illegitimacy are classifications which traditionally have been subject to strict or heightened review. *See, e.g., City of Cleburne, Texas v. Cleburne Living Center,* 473 U.S. 432, 440–441, 105 S.Ct. 3249, 3254–3255, 87 L.Ed.2d 313, 320–321 (1985). However, age, mental illness or mental retardation are not considered suspect or quasi-suspect classifications and have

been accorded the least searching level of judicial scrutiny. *See id.,* 473 U.S. at 441–446, 105 S.Ct. at 3255–3257, 87 L.Ed.2d at 321–324. Although appellants challenge the statute based on its disparate treatment of the mentally ill, their argument also asserts that the statute impinges upon their right to seek redress in the courts. An entitlement to monetary damages has not been deemed a fundamental right. *Dansby v. Thomas Jefferson Hospital,* 424 Pa.Super. at 557–558, 623 A.2d at 821. The appellate courts nonetheless have held that the right to access the courts is an important interest which is subject to an intermediate standard of review. *Id.,* (citing *James v. Southeastern Pennsylvania Transportation Authority,* 505 Pa. 137, 146–147, 477 A.2d 1302, 1306 (1984)). I will therefore apply a heightened standard of scrutiny to the extent that appellants' challenge implicates an important right.

Appellants contend that a mentally ill patient who receives health care is similarly situated to a non-mentally ill patient. However, this reasoning ignores the fact that the mentally ill are different, by virtue of their illness, from those who are not so afflicted. As previously noted, mentally ill patients may require more specialized or intensive health care than the non-mentally ill. Mental illness can also affect a person's ability to communicate and cooperate with his or her health care providers, thus rendering the administration of treatment more difficult. Consequently, mentally ill patients cannot be deemed similarly situated to those patients who do not suffer from a mental disorder.

More importantly, the instant statute does not impose a limitation only upon the rights of the mentally ill to institute suit. The MHPA grants health care providers immunity from civil and criminal liability for their treatment decisions and the consequences resulting therefrom regardless of whether it is the patient or another non-mentally ill third-party who is affected. *See* 50 P.S. § 7114(a), *supra. See Werner v. Commonwealth, Department of Public Welfare,* 109 Pa.Commw. 134, 137–138, 530 A.2d 1004, 1007 (1987) (construing section 7114 of the MHPA and rejecting assertion that section 7114

only precludes a third-party from commencing suit; in reaching this conclusion, the court stated that the legislature intended no distinctions between situations where a treatment decision results in harm to the patient or a third-party). The statute thus has the same impact upon the rights of the mentally ill as it does on the non-mentally ill. When viewed in this manner, it is clear that the statute does not treat the mentally ill any differently from the non-mentally ill with regard to their right to institute suit.

Assuming, *arguendo*, that appellants have made out a cognizable equal protection issue, the statute nonetheless withstands constitutional scrutiny. As previously observed, the mentally ill are different from those who are not mentally ill. The legislature was aware of these distinctions and the manner in which they may impact upon the ability of the mentally ill to obtain less restrictive and adequate treatment. Consequently, the legislature enacted the MHPA to protect the mentally ill and ensure that they receive adequate treatment in the least restrictive environment possible consistent with their particular treatment needs.

Protection of the mentally ill and provision for their adequate treatment are important and legitimate state interests. To encourage and facilitate this goal, the legislature decided to ameliorate certain risks by granting limited immunity from suit to those who have undertaken the burden of treating the mentally ill. The limited restriction on the right to institute suit bears a substantial relation to the goals sought to be achieved by the legislature and the important governmental interest involved. I accordingly deem the statute constitutional.

Based on the above analysis, I conclude that the trial has correctly interpreted and applied section 7114(a) by according appellees the limited immunity granted thereunder. I would therefore affirm the order.